In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3657

ALAN L. MATHENEY,

Petitioner,

v.

RONDLE ANDERSON,

Respondent.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 98 C 183--Allen Sharp, Judge.

ARGUED JUNE 29, 2000--DECIDED June 18, 2001

Before COFFEY, KANNE and ROVNER, Circuit
Judges.

COFFEY, Circuit Judge.  On March 7, 1989,
the State of Indiana charged Alan
Matheney in a two-count indictment with
murder and burglary. Matheney entered a
plea of not guilty as to both counts. In
April 1990, an Indiana jury found
Matheney guilty on both counts and
recommended the death penalty. The trial
judge agreed, and on May 11, 1990,
Matheney was sentenced to death.

After exhausting his state remedies,
Matheney filed a petition on July 10,
1998, in federal court pursuant to 28
U.S.C. sec. 2254 for a writ of habeas
corpus challenging his convictions and
death sentence. On July 30, 1999, the
district court, without holding an
evidentiary hearing, denied Matheney's
habeas petition. See Matheney v.
Anderson, 60 F. Supp. 2d 846 (N.D. Ind.
1999). The court proceeded to grant a
certificate of appealability on two
issues: (1) whether the state trial court
"should have found the petitioner
incompetent to stand trial or, in the
alternative, should have granted an
evidentiary hearing on the petitioner's
competency to stand trial"; and (2)
"whether the petitioner was denied
effective assistance of counsel at the
penalty and the sentencing phases of his
trial . . . ."

With respect to the second issue, Matheney claims that his trial attorney's performance fell below an objective standard of reasonableness when the attorney did not call the defense psychiatrist, Dr. Helen Morrison, to the stand during the penalty phase of the trial. Dr. Morrison had previously testified during the guilt phase of the trial, in support of Matheney's defense of insanity, that she believed Matheney suffered from a mental disease or defect at the time of the murder. Matheney claims that if Dr. Morrison had been called to the stand during the penalty phase, she could have offered testimony to establish the existence of a factor mitigating against imposition of the death penalty--that a mental disease or defect rendered Matheney incapable of conforming his conduct to the requirements of the law. We reject Matheney's claim because the trial judge, who is the ultimate decision-maker in matters of capital sentencing under Indiana law, stated on the record that he gave no weight to this mitigating factor because, after hearing the testimony during the guilt phase of the trial, he agreed with the two court-appointed psychiatrists that Matheney suffered from no mental disease or defect at the time of the murder. Thus, we are convinced that Matheney has failed to demonstrate a reasonable probability that additional testimony from Dr. Morrison during the sentencing phase of the trial would have resulted in imposition of a sentence other than death.

However, we remand this case for an evidentiary hearing on issues related to Matheney's alleged incompetency to stand trial and his lawyer's performance on issues related thereto. Matheney's trial attorneys filed a petition requesting the trial court to order independent psychiatrists to perform both a competency evaluation and a sanity evaluation. They then failed to follow through with the request for a competency evaluation after the trial court failed to include it in its order for a sanity evaluation. Given that a legitimate question has been raised as to Matheney's competency to stand trial and his lawyer's performance on this issue, we remand the case for an evidentiary hearing.

## I.  BACKGROUND

On March 4, 1989, the defendant, while on an eight-hour pass from prison, brutally murdered Lisa Bianco (his ex-wife and the mother of his two daughters, Amber and Brooke). The core facts of this case were succinctly set forth in the Indiana Supreme Court's opinion denying Matheney's direct appeal of his conviction:

On March 4, 1989, appellant was given an eight-hour pass from the Correctional Industrial Complex in Pendleton, Indiana where he was an inmate. Appellant was serving a sentence for Battery and Confinement in connection with a previous assault on his ex-wife, Lisa Bianco, who was the victim in this case. The passauthorized a trip to Indianapolis; however, appellant drove to St. Joseph County. Appellant went to the house of a friend, Rob Snider, where he changed clothes and removed an unloaded shotgun from the house without the knowledge of those present.

Appellant then drove to Mishawaka. He parked his car not far from Bianco's house and broke in through the back door. Bianco ran from her home, pursued by appellant. Neighbors witnessed the chase that ensued.

When appellant caught Bianco, he beat her with the shotgun which broke into pieces. One neighbor confronted appellant and saw him get into a car and drive away. Appellant surrendered to a policeman later that afternoon. The autopsy showed that Bianco died as a result of trauma to the head from a blunt instrument.

Matheney v. State, 583 N.E.2d 1202, 1204-05 (Ind. 1992), cert. denied, 504 U.S. 962 (1992).

It is worth noting that at trial the prosecution introduced overwhelming evidence of Matheney's murder of Bianco. Ray Matheney, appellant's brother, and Rob Snider, a friend of appellant, testified at trial that Alan Matheney arrived at Snider's home at about 1:00 p.m. on March 4, 1989. Snider further testified that when Petitioner left Snider's home approximately one hour later, a gun belonging to Snider's step-

son was missing. Matheney's daughter, Brooke, testified that she was at home with her mother in St. Joseph County on the afternoon of the Fourth when she saw her father enter the house and confront her mother. At her mother's request, Brooke ran next door to the home of Denise Sloan and asked Sloan to call the police. Sloan and several other neighbors testified that they watched Matheney violently assault and murder Bianco in the middle of the street by repeatedly striking her with a rifle./2 The evidence was so powerful that when defense counsel began his opening statement, he admitted: "On March 4, 1989, in the early afternoon, Alan Matheney beat his ex-wife to death in broad daylight, on a public streetcorner, in Mishawaka, Indiana." Defense counsel went on to argue that Matheney was insane at the time of the killing, his legal defense. Thus, Matheney's petition for habeas corpus relief centers not on a claim of innocence, but rather that the legal system failed to properly insure that he was mentally competent to stand trial for his crimes and subsequently to be sentenced to death.

A.  Pre-Trial Proceedings

   Subsequent to charges being filed against Matheney in the St. Joseph County Indiana Superior Court, the court appointed the Public Defender's Office to represent him. Public Defenders Philip Skodinski and Charles Lahey were jointly appointed and entered an appearance on Matheney's behalf. After defense counsels' initial consultation with their client, they learned that Matheney was of the belief that his ex-wife had been having an affair with a local county prosecutor, Mike Barnes, and further, that Matheney allegedly believed the two had schemed to falsely imprison Matheney on trumped-up battery and confinement charges to "keep him out of the way."

   On March 14, 1989, after learning of his client's belief in this conspiracy against him, Skodinski filed a "Notice of Insanity Defense and Request for Examination by Out-of-Area Psychiatrists for Purpose of Determining Competency to Stand Trial and Sanity at the Time of the Alleged Offense." The motion requested "the appointment of two court-appointed psychiatrists, from outside St. Joseph

County for the purpose of determining [1] the Defendant's competency to stand trial and [2] mental state at the time of the alleged offense." (emphasis added).

On March 27, 1989, the court held a hearing on defense counsel's motion and issued an order appointing two independent psychiatrists, Drs. Myron Berkson and George Batacan, to evaluate Matheney. The court's minutes state that the court ordered the doctors to evaluate Matheney as to (1) his sanity at the time of the offense, as well as (2) his competency to stand trial:

The Court further indicates that on March 27th this Court appointed Drs. Berkson and Balacan [sic], both of Michigan City, Indiana, for the purpose of determining competency to stand trial and sanity.

But on the same day as the hearing, the trial judge also signed a mimeographed order entitled "Order for Examination Concerning Sanity." This order made no mention of an investigation to determine the defendant's present competency to stand trial, but rather directed Drs. Berkson and Batacan to evaluate Matheney only with regard to his sanity at the time of the murder:

The Defendant, by his attorney of record, Phillip Skodinski, having filed notice of defense of insanity, the court now appoints Dr. Myron Berksen [sic], M.D. and Dr. George A. Balacan [sic], M.D. to examine the defendant, to file a written report with the court, and to testify at hearing concerning the sanity or insanity of the defendant at the time of the alleged offense.

****

Evidentiary hearing on defendant's sanity or insanity to be set upon receipt of the doctor's reports by the court. (emphasis added)./3

Furthermore, when the court implemented its order and issued written instructions to the court-appointed doctors dealing with the scope of the psychiatric reports to be submitted , the court failed to direct the doctors to conduct and make findings regarding Matheney's competency to stand trial, as originally requested by defense counsel. Instead, the court's

order limited the doctors' attention to the question of Matheney's sanity at the time of the commission of the crimes charged. The court's instructions to the independent psychiatrists read in pertinent part as follows:

IN YOUR OPINION, IS IT POSSIBLE THE DEFENDANT MAY HAVE BEEN INSANE AT THE TIME OF THE CRIME? DATE OF CRIME:

FROM YOUR EXAMINATION OF THE DEFENDANT, DO YOU HAVE AN OPINION AS TO WHETHER THE DEFENDANT, AS A RESULT OF MENTAL DISEASE OR DEFECT, WAS UNABLE TO APPRECIATE THE WRONGFULNESS OF HIS CONDUCT AT THE TIME OF THE OFFENSE?

"MENTAL DISEASE OR DEFECT" MEANS A SEVERELY ABNORMAL MENTAL CONDITION THAT GROSSLY AND DEMONSTRABLY IMPAIRS A PERSON'S PERCEPTION, BUT THE TERM DOES NOT INCLUDE AN ABNORMALITY MANIFESTED ONLY BY REPEATED UNLAWFUL OR ANTISOCIAL BEHAVIOR/4

B. The Doctors' Reports

1. Drs. Batacan and Berkson individually reported to the court that Matheney was sane at the time he committed the crimes

a. Dr. Batacan

Dr. Batacan filed a five page undated/5 report with the court indicating that he interviewed Matheney on two separate occasions, April 12, 1989, and June 21, 1989, "to determine the question of [Matheney's sanity] at the time of the commission of crime." Batacan's comprehensive report details, in narrative fashion, statements Matheney made during these interviews which explain how his anger lead to the murder of Bianco:

When he left [the prison, Matheney] drove to Granger to his family's home from where he called his wife [Bianco]. . . . She told him that they [Bianco and the prosecutor] would file more charges against him [and] that he'll never get out of prison. He grabbed an unloaded gun from a friend's house where he left some of his personal belongings. He was very upset at the time. Several things were going through his mind like "She killed her brother by giving him drugs, he was a

good friend of mine. . . . I have two beautiful children and she left them and they were playing with drugs. She abused those children. She was a hateful person . . . . I have no remorse for what happened, it was bound to happen because they put me in a position that I'll never get out of prison."

After Dr. Batacan completed two psychiatric interviews of Matheney which lasted a total of five hours, he made the following findings:

The defendant maintained a level of mental alertness throughout the examination and [was] able to engage in a[n] interview with spontaneity and cooperativeness. He is responsive, attentive and rather vigilant. His alertness refers to his ability to give an orienting response to the questions about any emotionally meaningful stimuli. He is coherent [in both] speech and thought. He sustains an ongoing ability of concentration without disruption. He is soft spoken and articulate.

He has an intact memory for both remote and recent events. He is fully oriented to time, place, person and specific situations. He denies experiencing unrealistic ideas and feelings. He has not experienced any distorted interpretation and perception of reality, such as hallucinations and delusions. His feelings of being aggrieved and beliefs of being unjustly [treated] are very real to him. His affect is appropriate. He does not show any signs and symptoms of mental disease or mental defect now nor during the event in question.

After relating his observations and findings, Dr. Batacan concluded that, despite Matheney's continuing belief that his imprisonment was the product of a conspiracy directed by a county prosecutor, Matheney "was legally sane at the time of the commission of the crime." Dr. Batacan concluded that (1) Matheney was not suffering from any form of "mental disease or defect" either at the time of the interviews or at the time of the murder of his ex-wife, and (2) Matheney was capable of recognizing the wrongfulness of his actions at the time the crime was committed.

    b. Dr. Berkson

    After interviewing Matheney twice,/6
Dr. Berkson filed a report dated April
19, 1989, opining "that Alan Matheney did
not suffer from a mental disease or
defect such [that] he was unable to
appreciate the wrongfulness of his
conduct at the time of the offense." Like
Dr. Batacan, Dr. Berkson supported his
opinion that Matheney was legally sane
during the commission of his crimes by
noting the observations he made while
interviewing Matheney:

He stated he was in good health, he was
aware of the nature of the charges
against him, he was aware of the
functions of the various individuals
involved in courtroom proceedings, he was
aware of the difference between a lie and
a mistake . . . . His verbalizations were
generally logical, sequential, goal
directed, and usually self serving. He
talked of his relationship with his ex-
wife who he felt had a personal
relationship with the prosecutor ****
[Matheney] reports he was told [that he
could not serve time in an out-of-state
jail], then he proceeded to give a rather
detailed account of his activities on the
day of the alleged offense.

He talked of increasing anger at his ex-
wife because he felt she was keeping him
incarcerated, that he had gone to her
home to get tapes that would have shown
he had done nothing wrong, that she and
Michael Barnes had no intention "of
letting me out of jail and would file
other charges against me." He then
detailed the rest of the events.

2. Neither Dr. Berkson nor Dr. Batacan
rendered an opinion concerning Matheney's
competency to stand trial.

    As discussed previously, there is
nothing in the record demonstrating that
Drs. Batacan and Berkson were ever
informed that competency to stand trial
was an issue to be evaluated or by what
standard competency was to be measured
under Indiana law. As a result of this
breakdown in communication, it is not
surprising that neither Dr. Batacan nor
Dr. Berkson filed reports relating a
conclusion as to Matheney's competency to
stand trial.

Conversely, it is startling that neither Matheney's counsel (who had properly seen fit to file a motion requesting an examination of Matheney's competency to stand trial) nor the trial judge (who, according to the court's minutes, purportedly ordered Drs. Batacan and Berkson to evaluate Matheney's competency to stand trial at the March 27, 1989 hearing on defense counsel's motion) ever raised a question regarding the reports' omission or inquired of the doctors as to whether they believed Matheney was competent to stand trial. The joint failure of defense counsel, the prosecution, and the court itself to (1) obtain qualified psychiatric evaluations from mental health professionals and (2) hold the hearing on defendant's competency to stand trial that defense counsel had requested is particularly perplexing in light of the fact that this is a capital offense case.

C. The Change of Venue

On March 20, 1989, the prosecution initially filed a motion for a change of venue to move the trial from St. Joseph County, Indiana, which Matheney's public defenders successfully opposed. Later that year, Matheney personally concluded that a trial outside of St. Joseph County would shield him from the influence supposedly wielded by prosecutor Michael Barnes, whom he believed to be the ringleader of the conspiracy./7 Matheney consequently filed a pro se motion requesting a change of venue, and at the December 21, 1989, hearing on the motion Matheney argued (over the strenuous objections of his attorneys) for a change of venue based on his belief that the alleged relationship between his deceased ex-wife and Barnes would taint his ability to get a fair trial in St. Joseph County, where Barnes served as a county prosecutor. At the hearing on his motion, Matheney stated:

I feel that there is to [sic] many major issues being overlooked in this case and I feel the reasons for that is because of the victim's relationship with a certain prosecutor. I also have copies of statements from other witnesses of a trial back in '87 where witnesses were told certain things and the same thing is being repeated with the same witnesses. They are being told to say certain things

by the prosecution . . . .

****

These attorneys here [his defense counsel], they're friends with Prosecutor Barnes in this case and they are not going to go in front of the courtroom and give a --, produce evidence to show that this guy was criminally involved in this case. They got to work with this man every day. To many issues of this --, Frankenstein is being overlooked, so I feel that by taking this out of the County, then I can get a hold of a Judge, whoever is going to sit on it, and try to convince him . . .

The trial judge granted Matheney's pro se motion for a change of venue, and the case was transferred to Lake County and assigned to Judge James Letsinger. As a result of the transfer of the case to Lake County, the court-appointed public defenders (Skodinski and Lahey) requested that they be permitted to withdraw from representing Matheney./8 Judge Letsinger denied defense counsels' request to withdraw, but did appoint Scott King, a Lake County defense lawyer well-versed in the defense of death penalty cases, to act as lead defense counsel. Skodinski and Lahey were instructed to remain as co-counsel and assist when necessary.

D.  Trial

As noted previously, Matheney's trial strategy admitted the murder of Bianco, but asserted that he was unable to appreciate the wrongfulness of his conduct at the time of his offense as the result of a mental disease or defect, and therefore legally insane. See Ind. Code sec. 35-41-3-6(a). To this end, defense counsel called Matheney's sisters who testified that he exhibited delusional behavior in jail when he requested copies of nonexistent documents that supposedly revealed the existence of Bianco's affair with prosecutor Barnes and its relation to his continued imprisonment. Defense counsel also called as witnesses attorneys who had previously represented Matheney in civil actions and thus were aware of his allegedly delusional behavior. Matheney's lawyers also called Dr. Helen Morrison, his defense psychiatrist, as their final witness./9 She testified that she had: 1)

interviewed Matheney; 2) reviewed his previous mental history and reports, including the court-ordered reports of Drs. Batacan and Berkson; and 3) reviewed tapes of recorded phone conversations between Matheney and Bianco. According to Dr. Morrison, Matheney suffered from a "severe paranoid personality disorder that impairs his perceptions of reality and his perception of what is going on." Furthermore, Dr. Morrison opined that Matheney's paranoid personality disorder was "consistent" with the definition of a "mental disease or defect" used in Indiana's insanity defense.

Interestingly, Dr. Morrison did not offer any opinion (nor was she asked by any party or the court) whether Matheney could distinguish right from wrong at the time of the commission of the crime, as required by Indiana's insanity defense statute. Ind. Code sec.35-41-3-6(a)./10 In fact, at post-trial deposition on October 7, 1994, Dr. Morrison testified that Matheney could appreciate the wrongfulness of his conduct at the time of the crime, and thus was sane:

Q: [I]n your opinion did Mr. Matheney understand the difference between right and wrong?

A: Yes, he did.

****

Q: Did you and Mr. King [defense counsel] ever discuss your inability to opine that as to the second prong or the volitional prong of the insanity defense in Indiana?

A: I am not certain what you mean.

Q: In your opinion Mr. Matheney could distinguish between right and wrong?

A: Yes.

Q: Did you and Mr. King ever discuss the fact that in your testimony you cannot satisfy the cognitive portion of the insanity defense?

A: No.

After the defense rested, the trial court called and questioned both the court-appointed psychiatric experts, Dr.

Batacan and Dr. Berkson, each of whom testified that Matheney was sane at the time he murdered his ex-wife because he was not suffering from "a mental disease or defect." On April 11, 1990, after one day of deliberation, the jury returned a verdict of guilty on both counts.

E. Sentencing

On April 12, 1990, a sentencing hearing was conducted before the same jury that had determined Matheney's guilt. At sentencing, neither the defense, the prosecution, nor the court chose to recall Dr. Morrison, Dr. Batacan, or Dr. Berkson. Defense counsel pursued a primary strategy of calling character witnesses, who testified that Matheney was a good father to his children, in an effort to stave off the death penalty. In his closing statement during sentencing, defense counsel relied primarily on the testimony of these character witnesses in asking the court to spare Matheney's life:

[We heard] testimony from the two friends of his, about Alan, and his brother was one of them, about Alan with the children. . . . He has produced and contributed to society, and has produced children. He has endeavored to maintain contact with his children, his daughters. There are positive aspects of this man. There is a humanity in this man.

Although relying primarily on character witnesses, defense counsel also argued that at the time of the murder, Matheney was unable to conform his conduct to the requirements of the law due to a mental disease or defect. Ind. Code sec. 35-50-2-9(c) lists the mitigating circumstances that a jury may consider when deciding whether to recommend the imposition of the death penalty. One qualifying circum stance, known as the "inability to conform" mitigator, states that capital punishment may not be appropriate if:

[t]he defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect . . . .

Ind. Code sec. 35-50-2-9(c)(6). At the sentencing hearing, defense counsel

asserted that the testimony elicited at trial established that Matheney suffered from a mental disease or defect that substantially impaired his ability to act lawfully:

Third, is subsection 6 under the mitigating circumstances, the ability to conform to the requirements of the law, appreciate wrongfulness of conduct, due to the existence of mental illness, mental disease. It's a cousin, sort of, of the insanity defense.

We have presented evidence, I believe, simply not medical evidence, but other evidence: something was wrong. And something was wrong with Mr. Matheney. Did he know right from wrong? There's arguments that are advanced and were advanced both ways. But here, we have the additional clause of the ability to conform one's conduct to the requirements of the law even if one is able to appreciate the wrongfulness of that conduct.

The jury rejected the defense's arguments and returned a unanimous recommendation that the death penalty be imposed. The trial judge agreed with the jury's recommendation, and on May 11, 1990, Matheney was sentenced to death./11

F.  State Court Post-Conviction Proceedings

In November 1992, Indiana Public Defender Jeff Merryman was substituted by the Public Defender's Office to represent Matheney. On November 25, 1992, Merryman filed a petition in Indiana state court requesting post-conviction relief on Matheney's behalf. At a September 9, 1994, hearing on the petition held before a state court magistrate, Merryman filed an amended petition for post-conviction relief raising the question of Matheney's competency to stand trial./12 The amended petition for post-conviction relief specifically asserted the following errors relating to Matheney's alleged lack of competency to stand trial:

8(G) Matheney was denied his right to a fair trial, to due course and due process of law, and to be free from cruel and unusual punishment when he was subjected

to a criminal trial despite being incompetent to understand the nature of the proceedings or to assist in defending the charges against him.

****

9(c)(6) Trial and appellate counsel were ineffective in their failure to notify the court that Matheney was incompetent at all stages of this litigation. Matheney was incompetent to stand trial, and was incompetent to proceed on direct appeal.

****

9(G) Matheney was not competent to stand trial. His inability to trust trial counsel rendered him unable to provide them with any meaningful assistance in devising a defense to the charges against him. Nor was Matheney able to form a rational understanding of the proceedings against him. Had Matheney's competence been pursued and properly litigated, Matheney would have been found not competent to defend the charges.

   Under Indiana law, a defendant is competent to stand trial if "the court finds that the defendant has the ability to understand the proceedings and assist in the preparation of the defendant's defense." Ind. Code sec. 35-36-3-1(b). In support of the post-conviction argument that Matheney was incompetent to stand trial, defense counsel presented the state magistrate judge with a combination of depositions and affidavits, drawn primarily from family members, former defense attorneys, Dr. Morrison, and Dr. Berkson, in an attempt to illustrate that Matheney could not assist in preparing his defense. Dr. Morrison's deposition testimony pointed out that she felt Matheney was not competent to be tried:

He [Matheney] was not rational. He continued through the time that I had seen him to believe that this was a conspiracy on the part of Michael Barnes and Lisa Bianco, that he would not be in the position if it had not been for them, that those tapes were the only thing that would exonerate him. I think I was asked a question about a session where those were the primary thoughts that continued with him. He had no concept in my opinion of what was going on as far as his role

in the trial was concerned. To him the only thing that was important and the only thing that this trial was going to do was to prove that he had not threatened Lisa Bianco because those tapes could be available.

****

He was not capable of [rationally consulting with trial counsel] because the delusion that he maintained interfered with any ability to look at the reality of what he needed to go through as far as the trial was concerned, what the charges were. Everything to him remained and remains a conspiracy. (emphasis added).

Contradicting Dr. Morrison's opinion were Matheney's three trial attorneys, who testified that Matheney did understand the proceedings and was able to assist in his own defense. When asked if he felt that Matheney was competent to stand trial, Philip Skodinski stated:

I think he was [competent]. I mean, some of his ideas were [not] good ideas, but that doesn't necessarily mean he wasn't competent to use his own defense. He wanted to interview people and use them as witnesses which some weren't very good people to use as witnesses. But I am not sure that's the criteria to provide you are not competent to assist in your own defense. It depends on what you feel is competent.

Public Defender Charles Lahey concurred with Skodinski, stating his belief that Matheney was competent to be tried: "Despite his obsessive conduct, I didn't find Alan that incapable of planning his own defense. In fact, he was actively planning it although it wasn't right in all regards." Lead defense counsel Scott King similarly testified that Matheney did not cooperate with counsel to the full extent of his ability "partially because he didn't want to."/13

After considering the relevant evidence presented and the arguments of counsel, the state court magistrate judge ruled that Matheney was competent to proceed with the post-conviction proceedings and then denied his petition for post-conviction relief, stating:

The repeated pro se criticisms of the attorneys, the courts, and the rulings on the admissibility of evidence, all are in themselves sufficient to support the conclusion that the petitioner had always had a very clear understanding of the nature of the proceedings even if he did not agree with others' opinions of what should be presented in those proceedings.

(Emphasis added).

G. State Court Post-Conviction Appeal

On April 1, 1996, Public Defender Merryman appealed the state trial court's denial of Matheney's petition for post-conviction relief. His 125-page appellate brief cited approximately 185 legal authorities in support of the following challenges to Matheney's conviction and sentence of death: (1) that the post-conviction state court erred in failing to reach the merits of his ineffective assistance of counsel claim after deciding that the pleadings were insufficient; (2) that Matheney was denied a full and fair hearing because the state court magistrate judge was biased and forced him to proceed in a post-conviction hearing when he could not rationally consult with counsel; (3) that trial counsel provided Matheney ineffective assistance in failing to request a hearing on his competency to stand trial; (4) that the prosecutor committed misconduct in cross-examining a witness at trial with inadmissible statements made by Matheney;/14 (5) that the jury instructions given at trial were fundamentally erroneous because they should have instructed the jury that Matheney was presumed to be insane under Indiana law; and (6) that the Indiana death penalty statute is unconstitutional.

The Indiana Supreme Court denied Matheney any relief on appeal./15 See Matheney v. State, 688 N.E.2d 883 (Ind. 1997), cert. denied, 525 U.S. 1148 (1999). As the third argument contained in Matheney's Indiana state post-conviction brief (that Skodinski, Lahey, and King were ineffective in failing to request a hearing on his competency to stand trial) is now before this court, we recount the Indiana Supreme Court's judgment. The Indiana Supreme Court held that defense counsel were not

ineffective:

Given the psychiatrists' determinations before trial, trial counsels' own opinions of Matheney's competency, and Dr. Berkson's earlier determination of Matheney's competency, trial counsel were not ineffective for failing to follow up their request for a determination of competency with a formal motion for a hearing on Matheney's competency.

Id. at 899.

## II.  ISSUES

As stated previously, the federal district court denied Matheney's petition for a writ of habeas corpus, but granted him a certificate of appealability on two issues: (1) whether the state trial court should have found Matheney incompetent to stand trial or, in the alternative, should have granted an evidentiary hearing on the petitioner's competency to stand trial due to the problem surrounding Matheney's initial request for such a hearing; and (2) whether Matheney was denied effective assistance of counsel at the penalty and the sentencing phases of his trial. We also consider Matheney's related argument that (3) he was denied effective assistance of counsel because his trial counsel failed to pursue his potential incompetency to stand trial, thereby granting, in part, his motion to expand the certificate of appealability. See Porter v. Gramley, 112 F.3d 1308, 1312 (7th Cir. 1997).

## III.  DISCUSSION

A. Standard for Determining Entitlement to Evidentiary Hearing

Matheney argues that the federal district court should not have denied him a writ of habeas corpus without at least holding an evidentiary hearing on his competency claims. Under 28 U.S.C. sec. 2254(e)(2), added by the Antiterrorism and Effective Death Penalty Act (AEDPA), the failure to develop a factual record in the Indiana courts adequate to adjudicate his competency claims potentially bars Matheney from having such a hearing:

If the applicant has failed to develop the factual basis of a claim in State

court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

(A) the claim relies on--

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

However, we have previously held that if the "fail[ure] to develop the factual basis of a claim in State court proceedings" can not be attributed to something the petitioner "did or omitted," Section 2254(e)(2) does not apply and it is then necessary to evaluate the request for an evidentiary hearing under pre-AEDPA standards. Burris v. Parke, 116 F.3d 256, 258-59 (7th Cir. 1997). We cannot say that Matheney, (rather than his counsel) "failed" to establish a record sufficient to analyze his claims on appeal as the record clearly establishes that the majority of Matheney's attempts to file pleadings with the state courts were refused and not considered. More importantly, justice dictates that a hearing on whether counsel was constitutionally deficient in failing to establish Petitioner's competency to stand trial cannot be barred by counsel's failure to secure a hearing and develop a record--the very product of the alleged ineffectiveness. See also Jones v. United States, 167 F.3d 1142, 1145 (7th Cir. 1999). We thus consider whether Matheney was entitled to receive an evidentiary hearing from the federal district court.

Under pre-AEDPA standards, a federal evidentiary hearing is required if (1) a habeas petitioner alleges facts which, if proved, would entitle him to relief and (2) the state courts--for reasons beyond the control of the petitioner--never considered the claim in a full and fair

hearing. Porter, 112 F.3d at 1317. The federal district court concluded that Matheney had not received a full and fair evidentiary hearing on his competency to stand trial from the Indiana state courts, Matheney v. Anderson, 60 F.Supp.2d 846, 860 (N.D. Ind. 1999), and we agree. In this respect we note that the Indiana Supreme Court did not discuss Matheney's due process and sua sponte competency to stand trial claims when it denied his petition for post-conviction relief. Matheney v. State, 688 N.E.2d 883 (Ind. 1997). Therefore, if Matheney has alleged facts in his petition that, if proved, entitle him to relief, he is entitled to an evidentiary hearing. Townsend v. Sain, 372 U.S. 293, 312-13 (1963) overruled on other grounds, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

B. Matheney Claims Trial Counsel Provided Ineffective Assistance By Failing To Pursue The Initial Request For A Competency Hearing

Under the section of the Indiana Criminal Code at issue, an Indiana trial court is required to hold a competency hearing before submitting the case to the jury if, at any time, it has "reasonable grounds for believing that the defendant lacks the ability to understand the proceedings and assist in the preparation of his defense." Ind. Code sec. 35-36-3-1(a). Matheney argues that he received ineffective assistance of counsel because his defense team did not pursue his request for a hearing on his competency to stand trial prior to the commencement of trial. To establish a claim for ineffective assistance of counsel, a petitioner must establish that: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) the attorney's deficient performance actually prejudiced the petitioner. Strickland v. Washington, 466 U.S. 668, 687 (1984). Courts deferentially review defense counsel's performance under the first prong, presuming reasonable judgment unless the factual record rebuts such a presumption. Strickland, 466 U.S. at 689. With regard to the second prong, the prejudice element, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id.

From the record before us, we cannot authoritatively state that defense counsel performed reasonably under Strickland's first prong when, for reasons unexplained, they allowed Matheney to proceed to trial without first obtaining the hearing on his competency to stand trial that they had previously filed with the court. The record is unclear, at best, as to why defense counsel, after filing a petition requesting that the trial court order independent psychiatrists to perform both a competency evaluation and a sanity examination, failed to follow through with the competency request when it became apparent that the trial court's order asked Drs. Batacan and Berkson for opinions solely related to the question of Matheney's sanity at the time of his offense. An adequate record is imperative to properly evaluate ineffective assistance claims. United States v. Draves, 103 F.3d 1328, 1335 (7th Cir. 1997). An evidentiary hearing must therefore be held to determine whether trial counsel performed reasonably with respect to the issue of Matheney's competency to stand trial.

As to the second prong of Strickland, Matheney argues that there is a reasonable probability he would have been found incompetent to stand trial and would not have been convicted if he had been allowed to proceed with a hearing on his competency to stand trial. A defendant who is tried and convicted of a crime while legally incompetent has been denied his due process right to a fair trial. Drope v. Missouri, 420 U.S. 162, 172 (1975); Pate v. Robinson, 383 U.S. 375, 378 (1966). The Supreme Court has held that if a state fails to observe its statutorily prescribed procedures aimed at testing whether a defendant is competent to stand trial, then that defendant's right to procedural due process has been violated. Drope, 420 U.S. at 172. Certainly, a question has been raised as to Matheney's mental capacity to stand trial by Dr. Morrison's deposition testimony, which reads in pertinent part:

He [Matheney] was not rational. He continued through the time that I had seen him to believe that this was a conspiracy on the part of Michael Barnes

and Lisa Bianco, that he would not be in the position if it had not been for them, that those tapes were the only thing that would exonerate him. I think I was asked a question about a session where those were the primary thoughts that continued with him. He had no concept in my opinion of what was going on as far as his role in the trial was concerned. To him the only thing that was important and the only thing that this trial was going to do was to prove that he had not threatened Lisa Bianco because those tapes could be available.

****

He was not capable of [rationally consulting with trial counsel] because the delusion that he maintained interfered with any ability to look at the reality of what he needed to go through as far as the trial was concerned, what the charges were. Everything to him remained and remains a conspiracy. (emphasis added).

Based upon the legitimate questions raised in the record relating to Matheney's competency to stand trial, we are of the opinion that Matheney was entitled to and should have received an evidentiary hearing on his petition. We thus remand Alan Matheney's case to the district court to hold an evidentiary hearing on three issues raised in his appellate brief surrounding his competency to stand trial: (1) whether Matheney was competent to stand trial in 1990; (2) whether Matheney's counsel were ineffective when they failed to pursue the initial request for a competencyhearing; and (3) whether the state trial court was obligated to hold a competency hearing sua sponte. See Lewis v. Lane, 822 F.2d 703 (7th Cir. 1987).

The district court will have access to the medical records from three doctors (Berkson, Batacan, and Morrison) who examined Matheney in 1989, including, but not limited to, psychiatric evaluations both before and after the commission of his crimes. In addition, the district court has the testimony from Matheney's criminal defense counsel and civil counsel that is already in the record. Finally, as the district court enjoys broad discretion in fashioning the scope of the hearing, Wright v. Gramley, 125

F.3d 1038, 1044 (7th Cir. 1997), it may well desire to consider any additional information that would assist the court./16

C. Petitioner Claims Trial Counsel Provided Ineffective Assistance At The Sentencing Phase Of His Trial By Failing to Present Additional Evidence That Petitioner's Alleged Mental Illness Was A Mitigating Factor.

Matheney also claims that during the sentencing phase of his trial, his attorneys failed to present evidence that he suffered from a "mental disease or defect" that prevented him from controlling his conduct at the time of the murder, and that this failure denied Matheney effective assistance of counsel. As with any allegation of ineffective assistance of counsel, we review Matheney's claim under the two-prong test of Strickland. As recently determined by the United States Supreme Court, we can only grant Matheney a writ of habeas corpus on this issue if we find that the Indiana Supreme Court's rejection of his claim was either "contrary to . . . or involved an unreasonable application of" the performance and prejudice rules set out in Strickland. Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). In other words, "we must determine that the state-court decision was both incorrect and unreasonable before we can issue a writ of habeas corpus." Washington v. Smith, 219 F.3d 620, 628 (7th Cir. 2000). Under Strickland, a petitioner must establish that his counsel's performance was deficient and that the petitioner was prejudiced by counsel's substandard performance. The petitioner "bears a heavy burden when seeking to establish an ineffective assistance of counsel claim." Drake v. Clark, 14 F.3d 351, 355 (7th Cir. 1994).

Matheney concedes that during the sentencing phase of the trial, his attorneys argued to the jury that he was suffering from a mental disease or defect that rendered him unable to conform his conduct to the requirements of the law. His attorneys also urged the jury to consider this to be a factor weighing against recommending imposition of the death penalty. However, Matheney argues that he was prejudiced when his counsel failed to present "readily available

evidence that, at the time of the crime, [Matheney] was 'grossly psychotic'" and unable to conform his conduct to the requirements of the law. The "readily available evidence" Matheney points to is testimony from Dr. Helen Morrison regarding the specific elements of the "inability to conform" death penalty mitigator. Matheney's ineffective assistance of counsel at sentencing claim argues that if such testimony from Dr. Morrison had been presented, there is a reasonable probability that the jury and judge would have reached a different conclusion as to whether imposition of the death penalty was appropriate. We disagree, and hold that the trial judge's stated rationale for choosing to give little or no weight to the "inability to conform" death penalty mitigator precludes a reasonable probability that additional testimony from Dr. Morrison could have had an effect on the judge's decision to impose the death penalty. Matheney was therefore not prejudiced by any arguable deficiency by counsel in this regard, and we affirm the district court's decision on this issue.

As discussed previously, to establish a claim for ineffective assistance of counsel, Matheney must demonstrate that: (1) his attorneys' performance at sentencing fell below an objective standard of reasonableness; and (2) his attorneys' deficient performance actually prejudiced him. Strickland, 466 U.S. at 687. With respect to the second, or "prejudice" prong of the Strickland test, the defendant must demonstrate that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

The second prong of the Strickland test has been applied to alleged errors of counsel committed during the sentencing phase of a capital case. As this court has previously held:

In the penalty phase of a capital case, to show prejudice the movant must demonstrate that "a reasonable probability exists that, but for counsel's substandard performance, the sentencer 'would have concluded that the

balance of aggravating and mitigating factors did not warrant death.'"

Foster v. Schomig, 223 F.3d 626, 636-37 (7th Cir. 2000) (emphasis added); see also Hall v. Washington, 106 F.3d 742, 751-52 (7th Cir. 1997); Strickland, 466 U.S. at 695.

We need not determine the first, or "performance," prong of the Strickland test, if we find that counsel's alleged deficiency did not prejudice the defendant. Strickland, 466 U.S. at 697; Milone v. Camp, 22 F.3d 693, 701 (7th Cir. 1994). We hold that Matheney cannot meet his burden of establishing prejudice because the trial judge's stated rationale for imposing the death sentence precludes a reasonable probability that additional testimony from Dr. Morrison would have affected the court's sentencing decision. Thus it is not necessary for us to decide the "performance" prong of the Strickland test and render an opinion on the objective reasonableness of counsel's decision not to call Dr. Morrison at the sentencing phase of the trial.

It is important to understand that under Indiana law, "the sentencer," as that phrase was used in Strickland and Hall, refers exclusively to the trial judge, and not the jury. While Indiana law provides for a jury recommendation on the appropriateness of the death penalty, the trial judge has the exclusive power to impose sentence, and is under no obligation to heed, or give substantial weight to, the jury's recommendation. Ind. Code sec. 35-50-2-9(e).

Indiana law is clear on this point. Even if a jury has recommended imposition of the death penalty, the trial judge is still required to independently weigh the evidence and reach a "separate conclusion":

[A]fter any jury recommendation pursuant to the death penalty statute, the trial court as trier of fact must independently determine the existence of aggravators and mitigators, weigh them, consider the recommendation of the jury, and come to a separate conclusion as to whether or not to impose the death penalty.

Kennedy v. State, 578 N.E.2d 633, 637

(Ind. 1991), cert. denied, 503 U.S. 921
(emphasis added).

In Indiana, however, unlike Mississippi,
the jury does not have the ultimate power
of decision. The jury makes a
recommendation to the judge about whether
or not to impose the death penalty, but
the judge is not required to follow the
recommendation--it is his decision to
make, not the jury's. . . . In Indiana,
the sentencing judge must give due
consideration to the jury's
recommendation, but he need not give it
any particular weight.

Fleenor v. Anderson, 171 F.3d 1096, 1098
(7th Cir. 1999) (emphasis added).
   Thus, to prevail on his ineffective
assistance at sentencing claim, Matheney
is required to demonstrate that but for
counsel's decision not to call Dr.
Morrison to the stand, there is a
reasonable probability that the trial
judge (not the jury) would have found
that the balance of aggravating and
mitigating factors did not warrant
imposition of the death penalty. As we
shall discuss below, the trial judge's
articulated reasons for imposing the
death penalty lead us to the conclusion
that there is no reasonable probability
that any additional testimony from Dr.
Morrison could have affected Matheney's
ultimate sentence.


   1. The Legal Standards

   The elements of the Indiana insanity
defense are slightly different than those
of the "inability to conform" sentencing
mitigator. However, for purposes of this
case it is important to focus on the
similarities between the two standards:
Both require proof that the defendant
suffered from a "mental disease or
defect." Indiana's insanity defense
statute provides as follows:

A person is not responsible for having
engaged in prohibited conduct if, as a
result of mental disease or defect, he
was unable to appreciate the wrongfulness
of the conduct at the time of the
offense.

Ind. Code sec. 35-41-3-6(a).

   As noted previously, Indiana's

"inability to conform" death penalty
mitigator states that the court may
consider the following as mitigation
against imposition of the death penalty:

The defendant's capacity to appreciate
the criminality of the defendant's
conduct or to conform that conduct to the
requirements of the law was substantially
impaired as a result of mental disease or
defect or of intoxication.

Ind. Code sec. 35-50-2-9(c)(6).

Both statutes require a defendant to
make the threshold showing of the
existence of a mental disease or defect,
although the required degree of
volitional impairment resulting from the
disease or defect differs under the two
standards. Obviously, if a defendant is
unable to establish that he suffered from
a mental disease or defect at the time of
the crime, he cannot establish either an
insanity defense or the death penalty
mitigator. A finding that a defendant did
not suffer from a mental disease or
defect precludes the application of both,
or either, of these statutes.


2. The Opinions of the Doctors

During the guilt phase of the trial, the
two independent expert witnesses
disagreed with Dr. Morrison on the issue
of whether Matheney suffered from a
"mental disease or defect" at the time of
the murder. Dr. Morrison opined that at
the time Matheney murdered his ex-wife,
he was suffering from a personality
disorder that was consistent with the
existence of a "mental disease."/17

Dr. Morrison's opinion was diametrically
opposed to that of the two independent
court-appointed psychiatrists who also
testified during the guilt phase of the
trial. Both Drs. Batacan and Berkson--
appointed to serve as neutral experts for
the court--opined that Matheney was not
suffering from a mental disease or defect
at the time of the murder. Both doctors
gave unequivocal testimony on this issue.
Dr. Batacan testified as follows:

Q: Okay, let me ask you the next question
in sequence, then. Did you, as a result
of questioning the defendant, Alan L.
Matheney, observe any symptoms of mental

disease or defect?

Q: No, your Honor, I did not.

Q: Are you able to, as a normal course, when a person does have symptoms of mental disease or defect, are you able to detect that by the method which you've outlined to us today?

A: Yes, your honor.

This opinion was reiterated in Dr. Batacan's written report, which stated that Matheney was not suffering from any "mental disease or defect, either at the time of the interviews or during the murder of his ex-wife." (emphasis added). As stated in his report, Dr. Batacan's opinion stems from his interviews with Matheney:

He has an intact memory for both remote and recent events. He is fully oriented to time, place, person and specific situations. He denies experiencing unrealistic ideas and feelings. He has not experienced any distorted interpretation and perception of reality, such as hallucinations and delusions. His feelings of being aggrieved and beliefs of being unjustly [treated] are very real to him. His affect is appropriate. He does not show any signs and symptoms of mental disease or mental defect now nor during the event in question. (emphasis added).

Dr. Batacan's conclusion that Matheney never suffered from a mental disease or defect was shared by Dr. Berkson. The second independent expert testified as follows:

Q: Are you able to discern symptoms of mental disease or defect by questioning a subject like that?

A: Yes, sir.

Q: Did you, as a result of your examination, discover any symptoms of mental disease or defect in Mr. Matheney?

A: No, sir, I did not.

In his written report to the court, Dr. Berkson confirmed his conclusion that "Alan Matheney did not suffer from a mental disease or defect . . . at the

time of the offense."/18

3. The Trial Judge's Sentencing Decision

Bearing in mind the applicable legal standards and the content of the three psychiatrists' trial testimony regarding the existence of a mental disease or defect, we turn now to the trial judge's sentencing decision. For purposes of Matheney's ineffective assistance at sentencing claim, a crucial consideration is the rationale given by the judge for not giving weight to the "failure to conform" mitigator. Significantly, the record does not reflect a finding by the judge that Matheney had failed to submit convincing evidence that he was unable to conform his conduct to the requirements of the law (the omitted sentencing testimony on which the dissent relies). Indeed, it was not necessary for the judge to reach that issue once he chose to give no credence to Dr. Morrison's threshold premise that Matheney suffered from a mental disease. The judge's sentencing decision correctly makes no distinction between a diagnosis of "mental disease or defect" offered in support of the insanity defense and one offered in support of the death penalty mitigator, as the element is a prerequisite to the application of both statutes. The judge's sentencing decision implicitly recognizes that it makes no difference when Dr. Morrison's opinion on the existence of a mental disease was offered--during the guilt phase of the trial, the sentencing phase, or both. The rejection of this opinion for one purpose is a rejection of the opinion for both purposes.

At sentencing, the court identified and discussed each of the mitigating factors it considered. With respect to the "failure to conform" mitigator, the court stated the following on the record:

6. Standard: The defendant's capacity to appreciate the criminality of the defendant's conduct or to conform the conduct to the requirements of the law was substantially impaired as a result of mental disease or did he [sic] defect or of intoxication. Facts: This mitigating factor is the old insanity defense since repealed. It's definition contains the cognitional function as well as the volitional function of the mind. Since it

has not been repealed, it will be considered as it presently exists. The defense expert, Dr. Morrison, offered a diseased mind diagnosis rejected by the jury. Mr. Matheney has proven to be aware of the criminal justice system including methods to manipulate it. The Court concurs with Dr. Batacan and Dr. Berkson that the defendant has been feigning symptoms of mental illness. This defense was rejected by the jury. However, that does not dispose of the issue. It may be considered a mitigating factor though not rising to the level of a defense. It should also be noted here that the verdict form in Phase I of guilty but mentally ill was not selected by the jury. The jury, as well as the Court, has concluded that mental disease or defect was nonexistent in this case. Neither was the defendant acting under an irresistible impulse. He had been planning this murder for some time. He had solicited others in prison to kill Mrs. Bianco. These plans, of course, proved unsuccessful. There was no evidence that he had been drinking or on drugs.

(emphasis added).

As the preceding quote from the transcript makes clear, the trial judge thoroughly considered all the evidence and the opinions offered by the medical experts and chose to believe, or give greater weight to, the opinions of Drs. Batacan and Berkson that Matheney was not suffering from any mental disease or defect at the time of his fatal assault on his ex-wife. It is not our role to second-guess a credibility determination made by an experienced trial judge for purposes of sentencing. United States v. Tolson, 988 F.2d 1494, 1497 (7th Cir. 1993). The judge's decision to reject Dr. Morrison's diagnosis is critically important because the existence of a mental disease or defect is the element common to both the insanity defense and the "inability to conform" death penalty mitigator. A failure to convince the jury or judge that a defendant is suffering from a mental disease or defect precludes application of both the insanity defense and the death penalty mitigator, and this is what happened in Matheney's case. Had Dr. Morrison been recalled to the stand during the penalty phase of the trial, her opinion as to the existence of a

mental disease or defect would obviously have been the same opinion she gave during the guilt phase of the trial. In light of this fact, and the judge's clearly enunciated reasoning for rejecting the mitigating factor, we are convinced that Matheney has failed to demonstrate a reasonable probability that additional testimony from Dr. Morrison would have led the trial judge to impose a sentence other than death.

This would be quite a different case had the trial judge based his sentencing decision on a conclusion that Matheney was suffering from a mental disease, but that Matheney had failed to produce evidence that the disease rendered him incapable of conforming his conduct to the requirements of the law. If that were the case, a credible argument could be advanced that additional testimony from Dr. Morrison might have affected the court's sentencing decision. As the record stands, the judge's rejection of the existence of a mental disease or defect is determinative of this issue on appeal. The district court's decision must therefore be affirmed in this respect.

4. Aggravating Sentencing Factors

Alternatively, even if Dr. Morrison's testimony had been presented at sentencing, and even if the sentencing judge had for some reason given credence to her opinions on the second go-around, this alone does not establish a reasonable probability that Matheney would not have received the death penalty. Under Indiana law, the presence of one (or more than one) mitigating factor does not preclude imposition of the death penalty. Rather, the statutory aggravating factors are weighed against the mitigating factors, and the resulting balance determines the appropriateness of the death penalty. Kennedy, 578 N.E.2d at 637; see also Foster, 223 F.3d at 637. The majority disagrees with the dissent's conclusion that evidence of the aggravating factors was "not strong." We are convinced that the existence of aggravating factors was more than sufficient to uphold imposition of the death penalty even in the face of testimony that Dr. Morrison might have presented in the sentencing phase of the

trial.

     a. Lying-in-Wait Aggravator

  The dissent characterizes the evidence supporting the "lying-in-wait" aggravator as "weak at best," but this view is not supported by the record. Indeed, the dissent offers no explanation for its position that the evidence was "weak," other than to cite a dissenting opinion from one justice on the Indiana Supreme Court out of the five who heard the case. The majority interprets the fact that a majority of the Indiana Supreme Court found the evidence of aggravating factors to be sufficient to uphold the sentence to be testament to the strength of that evidence rather than its "weakness," and we are at a loss to understand how the dissent can view it in any other fashion. The totality of the evidence paints Matheney as a cold, calculating killer-- one clear-headed enough to scheme and plan the fatal act. The record demonstrates that: (1) Matheney parked his vehicle in a parking lot near an alley behind Bianco's house, a full city block away, despite the fact that there was available parking in close proximity to the home; and (2) Matheney approached the home not via the front door or the city street, but rather by approaching from the rear, walking down an alley and through a backyard secluded by a dense growth of bushes and trees, a large wooden gate, and a garage. These facts were not contested by Matheney at trial, and they obviously lend much credence to the prosecution's theory that Matheney's objective was to surprise Bianco and violently assault her while she remained in an off-guard and vulnerable position. The Indiana Supreme Court summarized its opinion on this issue as follows:

It would be reasonable for the trier of fact to conclude that appellant had used a circuitous approach toward Bianco's house in order to conceal himself from her and that testimony regarding the amount of time involved tended to prove that appellant waited and watched until he could take Bianco by surprise. The evidence regarding his use of a deadly weapon was indicative of his intent to kill. The evidence was sufficient to support the finding that this aggravating factor was proven beyond a reasonable

doubt.

Matheney, 583 N.E.2d at 1208-09.

The prosecution convincingly established a time-line showing that: (1) Matheney went to Snider's home to obtain a weapon and left Snider's home with the shotgun at approximately 2 p.m.; and, (2) he did not break into Bianco's home until at least an hour later, despite the relative proximity of the two residences. From this time-line, and the evidence of Matheney's roundabout approach and entry into Bianco's home, it is reasonable to conclude (as the trial court did) that Matheney was "lying in wait" in Bianco's backyard in an effort to take her by surprise. See Matheney, 583 N.E.2d at 1204-05.

In fact, as recognized in the dissent, throughout the long appellate history of this case, only Justice DeBruler alone of the five member Indiana Supreme Court was of the opinion that the evidence and time-line did not adequately support a finding that the "lying-in-wait" aggravator was proven beyond a reasonable doubt. Once again, the majority interprets the fact that only a single justice questioned the trial judge's decision on the lying-in-wait aggravator as a testament to the strength of that evidence.


        b. Felony Murder Aggravator

The dissent takes the position that the intentional killing while committing a burglary aggravator should not have been be given much weight in the trial court's sentencing decision. In effect, the dissent is re-weighing the evidence and goes on to characterize the evidence supporting this aggravator as being "not as compelling in this case as in others." Once again, the dissent relies exclusively on the dissenting opinion of a single Justice of the five-member Indiana Supreme Court as support for the position that the felony murder aggravator is not "compelling" when the burglary is accomplished for purposes of committing the murder, as opposed to a separate felony. Obviously, the majority of the Indiana Supreme Court did not agree with this position, nor do we. We agree with the Indiana Supreme Court that

the felony murder aggravator applies to the very situation present in this case-- forcible entry of a residence with the intent to commit murder. Matheney, 583 N.E.2d at 1207.

The testimony from witnesses, including Matheney's own young daughter, demonstrated that Matheney burst through the back door of Bianco's home and confronted his ex-wife in the presence of their daughter, while armed with the shotgun that he later used to bludgeon Bianco to death with such force that the weapon was literally smashed to pieces. See Matheney, 583 N.E.2d at 1204-05. Matheney's violent assault and ultimate murder of Lisa Bianco was horrific in and of itself; the fact that it was accomplished by a forcible surprise attack in the home makes it all the more reprehensible, given the recognized importance of the "home as a sanctuary." See Moore v. Marketplace Restaurant, Inc., 754 F.2d 1336, 1343 (7th Cir. 1985); Welsh v. Wisconsin, 466 U.S. 740 (1984).

### c. Balancing the Sentencing Factors

Under Indiana law, a sentencing judge is not permitted to consider evidence supporting a mitigating factor in isolation. Rather, the judge is obligated to balance the strength of such evidence against the facts supporting the aggravating factors. In light of the facts underscoring the brutal nature of this crime and its occurrence inside the supposed sanctuary of Bianco's home, we are not convinced that additional testimony from Dr. Morrison at sentencing, if it had been presented and believed, would have necessarily tipped the balance against imposition of the death penalty. As we noted in Foster:

Sentencing judges may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate.

Foster, 223 F.3d at 637.

We must remember that the judge heard substantial evidence demonstrating

Matheney's extensive planning and deliberate execution of the fatal assault. The judge also heard testimony from the arresting officer that Matheney was calm, relaxed, and displayed no nervousness or distress when he turned himself in approximately two hours after committing the murder. Rather, Matheney calmly informed the officer that he assumed his ex-wife had died as a result of his assault. The officer testified that between the time of the murder and the time he turned himself in, Matheney's primary concern was with purchasing cigarettes to take with him to jail. These facts, demonstrating the deliberate, well-planned and fully premeditated nature of the murder, were uncontested by Matheney at trial. The judge also heard evidence concerning the extreme violence of the murder; how the shotgun was smashed into pieces by the force of Matheney's blows to Bianco's body. In light of the aggravating circumstances set forth in this record, we certainly cannot agree that there is a reasonable probability that the presence of a single mitigating factor would necessarily have staved off imposition of the death penalty. For this additional reason, we are convinced that Matheney was not prejudiced, even if one accepts the premise that his counsel did not perform reasonably at sentencing.

IV. CONCLUSION

We affirm the district court's decision that the petitioner's ineffective assistance of counsel claim with respect to the sentencing phase of his trial is without merit. We also hold that the petitioner is entitled to an evidentiary hearing in the district court in order that he might be given the opportunity to offer evidence to develop the factual basis of his claim surrounding his competency to stand trial. This case is REMANDED to the district court with INSTRUCTIONS to proceed with an evidentiary hearing consistent with this opinion.

FOOTNOTES

/1 Matheney and Bianco were divorced on June 19, 1985, and Bianco was awarded custody of the couple's two daughters. Matheney initially was granted supervised visitation. On the day of his first unsupervised visitation, July 3, 1985, Matheney seized his children and left Indiana for

other parts of the United States. He was apprehended on August 23, 1985, in North Carolina and charged with confinement. He was convicted and sentenced on the confinement charge and of a battery charge stemming from an earlier physical attack on his ex-wife.

/2 Bianco's neighbor Wilbur Stockdale testified that he opened the front door of his home, yelled at Matheney, and then chased him until Matheney reached his car and drove away.

/3 The "Order for Examination Concerning Sanity" issued by the court was a "form" order containing boilerplate language regarding the appointment of doctors for an investigation into the sanity of a criminal defendant at the time of the commission of the offense.

/4 Judge Swartz instructed the doctors in conformity with Indiana's legal test for insanity, codified at Ind. Code sec. 35-41-3-6(a), which states:

A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

The definition of "mental disease or defect" contained in her instructions quotes the definition adopted by the legislature. See Ind. Code sec. 35-41-3-6(b).

/5 In addition to being undated, the report is devoid of any file-stamp date as to when the report was filed with the court. Therefore, it is impossible to specifically determine when the report was prepared, other than to note it was after June 21, 1989 (the date of Dr. Batacan's second interview with Matheney) and prior to May 1990 (when Dr. Batacan testified at Matheney's trial).

/6 Dr. Berkson's report states that he interviewed Matheney on two different occasions, once on April 14, 1989, and on a previous date, but the report fails to disclose the date of the first interview.

/7 Not surprisingly, there is nothing in the record that supports Matheney's claim that Barnes' prosecution of him was prompted by any improper motive.

/8 Skodinski and Lahey argued that, as public defenders for St. Joseph County, the change of venue outside St. Joseph County imposed severe transportation and caseload difficulties upon them.

/9 Dr. Morrison testified that she maintained a practice in both Hammond, Indiana, and Chicago, Illinois. She further testified that she had been certified as an expert in more than 100 previous trials and had testified for both the prosecution and defense. Prior to testifying for Matheney, she had testified "three or four times" in Indiana, always for the prosecution.

/10 As noted, Indiana law requires that a defendant asserting the insanity defense prove both: (1) the existence of a mental disease or defect, and (2) that as a result of the mental disease or defect, he could not appreciate the wrongfulness of his conduct at the time of the crime. See Ward v. State, 438 N.E.2d 750, 753 (Ind. 1982).

/11 In 1992, Matheney was denied relief by the Indiana Supreme Court on direct appeal. The court held that: (1) Matheney was not entitled to have the jury instructed on manslaughter grounds because there was no evidence that Bianco had "provoked" him into acting with the "sudden heat of passion"; and (2) sufficient evidence supported the trial court's decision that the prosecution proved aggravating circumstances warranting imposition of the death penalty. See Matheney v. State, 583 N.E.2d 1202 (Ind. 1992), cert. denied, 504 U.S. 962 (1992).

/12 On the same day as the hearing on Matheney's petition for post-conviction relief, defense counsel sought a stay of the post-conviction proceedings on the ground that Matheney was incompetent to proceed with the hearing. Interestingly, Matheney resisted his attorneys' tactics by filing pro se motions offering to prove his own competence to proceed with the post-sentencing hearing.

/13 Further, on direct questioning from the state magistrate judge at Matheney's state post-conviction proceedings, Matheney exhibited a level of knowledge that led the state magistrate judge to determine that Matheney was competent to proceed with the post-conviction hearing:

Q. Mr. Matheney, do you know who I am?

****

A. Magistrate Page.

Q. And do you know what my function is here?

A. Today you are presiding over this post conviction hearing. . . .

Q. What is a post conviction hearing?

A. The attack of the legalities of your convic-
tion, whether it was legal or illegal, to bring
up issues that you feel that a defendant has a
right to a new trial or sentence relief or
whatever.

****

Q. Your attorneys have filed a Petition for Post
Conviction Relief, in which numerous grounds are
alleged. Have you had an occasion to read this
petition?

A. I read it a couple of times, and I just paid
attention to the grounds that pertained to me.
There's a lot of stuff in there, statutorily,
that they put in everybody's death penalty; and
I didn't pay too much attention to, because
they've already been ruled on over and over
again.

Q. And the doctor said that you felt or seemed to
indicate or give the impression that you felt
that these issues were frivolous, because the
only issue you feel is relevant is the one about
[the alleged conspiracy between your wife and the
prosecuting attorney at your trial] or this--

A. No. There's a lot of issues in there that I
agree with. The only ones that I didn't agree
with were the ones that they keep putting in
everybody's issue, that the Supreme Court keeps
turning down.

****

Q. Well, the general challenges to the death
penalty itself?

A. Right, yes.

Q. You feel that those are a waste of time
because of the previous rulings of the Supreme
Court?

A. Yeah. When I discussed them, they said, well,
you never know when you're going to get a new
Supreme Court; but a new Supreme Court don't come
along often enough in this decade.

Q. Does that seem unreasonable for them to take
that position? Have you not seen cases where a
court will rule the same way over and over again;
and then all of a sudden, along comes the same
question and they say, well, now that we think
about it, we've changed our mind?

A. Yeah, I've seen cases like that. I just felt
that there could have been more issues investi-
gated and put in this than what was . . . . I

believe during this whole thing that they want to investigate my childhood. Well, that has absolutely nothing--what I repeatedly told them, over and over again, is that what you should concentrate on is what had taken place, you know, the death of Lisa Bianco, and what caused it; and we should concentrate on investigating this particular, you know, period of time. Going back to my childhood 30 or 40 years ago, to me, doesn't seem like it's--you know, it's a waste of time, a waste of valuable time. I think time could be better spent on investigating things about the incident itself.

/14 At trial, prosecutors had cross-examined Mike Scopelitis, an attorney who had represented Matheney in his divorce from Bianco, with a series of questions focusing on whether Matheney had ever admitted to Scopelitis that he had threatened Bianco. The prosecution based its questions to Scopelitis on the content of tape-recorded phone calls that had been excluded by the trial judge as inflammatory.

/15 The Indiana Supreme Court held: (1) Matheney was competent to stand trial; (2) he was not denied a fair trial as a result of the trial court's refusal to allow defense counsel to call a prosecutor as a defense witness on the issue of insanity; (3) that viewing the totality of the circumstances, no constitutional error was committed in the sentencing procedures. Matheney v. State, 688 N.E.2d 883 (Ind. 1997), cert. denied, 525 U.S. 1148 (1999).

/16 For example, the district court may decide that additional psychiatric analysis will be helpful to its decision. United States v. Franzen, 686 F.2d 1238, 1247 (7th Cir. 1982) (noting that habeas petitioner's "possible lack of fitness appears to be of a permanent rather than transitory nature; therefore further medical or psychiatric testing may be relevant.").

/17 The majority is perplexed by the dissent's insistence that Dr. Morrison was not properly prepared by defense counsel to testify at trial. If, in fact, Dr. Morrison's potential testimony at sentencing regarding Matheney's mental condition would have had the substantial impact that the dissent attempts to ascribe to it, we fail to understand how she could have been unprepared to testify. Moreover, simply asserting that defense counsel did not spend sufficient time with a witness prior to trial is insufficient to maintain a claim for ineffective assistance of counsel. United States v. Olson, 846 F.2d 1103, 1108 (7th Cir. 1988). As we noted in Olson, an experienced attorney can accomplish far more in a single conference with a witness than a neophyte

lawyer can get out of several. Id.

In any event, whether or not defense counsel properly prepared Dr. Morrison to testify at sentencing is not relevant to our analysis because we find that her opinion, even if it had been presented as the dissent characterizes it, would not have altered the trial judge's decision to impose the death penalty. After Dr. Morrison testified during the guilt phase of the trial, the trial judge was fully aware of her opinion that Matheney was suffering from a mental disease or defect at the time of the murder. The judge weighed that opinion against the contrary opinions of Drs. Batacan and Berkson and chose to give greater credence to the opinion of the court-appointed psychiatrists. The judge's sentencing decision also carefully weighed and considered all the testimony presented by law enforcement personnel regarding the nature of the crime and the entire criminal investigation.

/18 The dissent's quotation from Dr. Berkson's trial testimony is taken out of context. Dr. Berkson did not merely testify that Matheney did not suffer from a mental disease that rendered him incapable of distinguishing right from wrong. Dr. Berkson testified that at the time the murder was committed, Matheney did not suffer from any mental disease or defect at all.


ROVNER, Circuit Judge, concurring in part, dissenting in part. I join in the majority's thorough opinion regarding the issue of Matheney's competence to stand trial. I write separately only because I would reverse the district court on the sentencing issue as well because Matheney's trial attorney failed to present critical mitigating evidence at the sentencing hearing.

A defendant's mental disease or defect is relevant both to an insanity defense and to the death penalty determination, but the standards are different in those two contexts. The insanity defense does not apply if a defendant is able to appreciate the wrongfulness of his conduct, even if the defendant is unable to conform his conduct to the requirements of the law. Matheney v. State, 688 N.E.2d 883, 898 (Ind. 1997), citing Ind. Code sec. 35-41-3-6 (West 1986). In contrast, it is a mitigating factor at sentencing that a defendant was unable to conform his conduct to the requirements of the law. Id., citing Ind. Code sec. 35-50-2-9(c)(6) (West Supp. 1996). Therefore, a jury's rejection of the insanity defense at trial does not preclude the application of that mitigating factor at sentencing.

Matheney's counsel chose to argue that mitigating factor at the sentencing hearing, but failed to produce the critical evidence supporting it. Matheney's counsel argued that, even if Matheney was not able to prove insanity because he could distinguish right from wrong, he nevertheless could establish the presence of the mitigating factor because he was unable to conform his conduct to the requirements of the law. As the majority recognizes, Matheney's counsel did not make a tactical decision to forego that mitigating factor in favor of others, but affirmatively argued that factor. His counsel failed, however, to introduce any psychiatric testimony establishing that Matheney was unable to conform his conduct to the requirements of the law. At a hearing on Matheney's petition for post-conviction relief, Dr. Morrison testified that Matheney understood that his conduct was wrongful, but that his actions at the time of the murder were defined by the delusions he experienced, rendering him incapable of conforming his behavior to the requirements of the law. In other words, her testimony would have been consistent with the jury verdict rejecting the insanity defense, but would have established the mitigating factor based on his mental illness. Matheney's counsel failed to present that testimony--or any testimony--to support the argument that the mitigating factor was met. That failure may be explained by Dr. Morrison's testimony that defense counsel spent only one hour with her preparing her for the deposition, and no time subsequent to that preparing her to testify at trial. Defense counsel never even described the standards for insanity or the mitigating factors under Indiana law, and never asked her at trial or sentencing the critical questions of whether Matheney could appreciate the wrongfulness of his conduct and conform his conduct to the requirements of the law. That lack of preparation by trial counsel is telling given that Matheney's defense was insanity, Dr. Morrison was the key psychiatric witness, and the strongest factor mitigating against the death penalty was his mental illness.

Because Matheney's counsel failed to present Dr. Morrison's testimony at sentencing, and failed to elicit that critical testimony at trial which then could have been considered by the jury at sentencing, the jury had no basis upon which to accept the defense argument in mitigation. Where the defense counsel argues a mitigating factor but fails to present any evidence whatsoever to establish that factor even though such evidence is readily available, we cannot excuse that conduct as a tactical decision. We cannot assume that the jury's rejection of the insanity defense would have doomed a defense argument at sentencing based on mental illness, given that the

standards were different and Dr. Morrison's testimony would have been consistent with the jury's verdict. See, e.g., Eddmonds v. Peters, 93 F.3d 1307, 1325 (7th Cir. 1996) (Flaum, J., and Rovner, J., concurring) ("A determination of sanity [ ] cannot be a sufficient reason to forego inquiry into psychological problems for mitigation purposes.") citing Stephens v. Kemp, 846 F.2d 642, 653 (11th Cir. 1988), and Loyd v. Whitley, 977 F.2d 149, 156-57 (5th Cir. 1992).

The failure to present Dr. Morrison's testimony was prejudicial because it was by far the strongest mitigation evidence Matheney possessed. Dr. Morrison's testimony would have provided a perspective on Matheney that integrated the evidence of mental disease and defect provided at trial but harmonized with the jury's rejection of the insanity defense. Absent that testimony, the jury had no reason to distinguish the insanity defense from the mitigating factor. Therefore, the testimony by Dr. Morrison was pivotal to the strongest mitigating factor available to Matheney. His defense counsel chose to argue for that mitigating factor, but never presented the psychiatric testimony that would provide the necessary foundation for it.

Moreover, although Drs. Batacan and Berkson did not appear to agree with Dr. Morrison's analysis, defense counsel had many avenues available to either discredit or reconcile their opinions. For instance, Dr. Batacan testified that in order for a condition to constitute a "mental disease or defect" by the legal definition, it must include hallucinations. In fact, he stated that even if a person experienced delusions, depression, or other symptoms, "in the absence of hallucination, there is no mental disease." Tr. at 1539-40. Because there was no evidence that Matheney experienced hallucinations, Dr. Batacan concluded that he did not possess a mental disease or defect. Even Dr. Berkson agreed that Dr. Batacan's interpretation of mental disease or defect was wrong. Given Dr. Batacan's fundamental, and rather stunning, misunderstanding of the term "mental disease or defect," his opinion was incorrect as a matter of law, and thus entitled to no consideration.

Dr. Berkson's testimony did not suffer from a similar fundamental error, but it was not without its limits. In both his written report and his trial testimony, Dr. Berkson concluded that Matheney "did not suffer from a mental disease or defect that would render him incapable of distinguishing right from wrong." That precluded the insanity defense, but was perfectly consistent with Dr. Morrison's opinion. In fact, at the post-conviction deposition, Dr. Berkson stated

that his opinion was not inconsistent with Dr. Morrison's. Dr. Berkson further attested at that deposition that Matheney suffered from a mental disease--paranoid personality--which affected Matheney's behavior but not his ability to appreciate the wrongfulness of the offense, and thus did not rise to the level of legal insanity. Dr. Berkson's statements at the post-conviction deposition make clear that if defense counsel had more thoroughly explored his opinion, they could have elicited testimony that would have been helpful at sentencing and that would have been consistent with Dr. Morrison's opinion. In fact, Dr. Berkson in his written report prior to trial left open the possibility of altering his opinion if provided additional evidence by defense counsel. In that report and at the post-conviction deposition, Dr. Berkson stated that he had called Matheney's attorneys seeking further information, but had no contact with those attorneys after that time and never received further information from them. Therefore, Dr. Berkson's opinion, properly developed by defense counsel, would have been consistent with Dr. Morrison's opinion, and would have significantly impacted the determination by the judge and the jury of whether Matheney suffered from a mental disease or defect. Accordingly, even in light of the opinions of Drs. Batacan and Berkson, Dr. Morrison's opinion could have been strong evidence of the mitigating factor.

The existence of a mental disease or defect that rendered him incapable of conforming his conduct to the law would have been a significant mitigating factor, and there is a reasonable probability that it would have altered the jury's recommendation--particularly because the aggravating factors were not strong here. The two aggravating factors were that the offense was committed (1) by lying in wait and (2) during the course of a burglary. Although the majority devotes much time to discussing the brutality of the crime, a point I do not question and with which I am in agreement, it is not one of the aggravating factors that are available to the jury, and therefore cannot be a part of this analysis. We are limited to considering the two identified aggravating factors.

The lying-in-wait factor was based upon evidence that he approached the home from the rear, and that the timeline established by the prosecution allowed for a conclusion that he waited behind the house before entering. That evidence was weak at best, and a dissenting justice of the Indiana Supreme Court declared that there was no basis to find that factor. Matheney v. State, 583 N.E.2d 1202, 1210 (Ind. 1992) (DeBruler, J. dissenting). The burglary factor was premised on Matheney's

actions in breaking through the door and entering the home in search of his wife. Burglary requires a forcible entry with the intent to commit a felony, but there was no intent to commit a separate felony here such as robbery or rape, which would elevate the murder to another level by adding an additional intended felony. Instead, the intent for the burglary was the intent to commit the murder, the same intent necessarily found for the murder charge itself. Therefore, the aggravating factor of the burglary is present here, but is not as compelling in this case as in others, because it did not encompass an intent to commit a separate felony. See id. at 1210 (DeBruler, J. dissenting) ("where the intent of the burglary is the intent to kill, the weight of the aggravator is greatly diminished, for the mind has formed but a single felonious intent.") Thus, the jury would have been required to balance the evidence that in committing the murder he may have waited in the yard for a short time and then forcibly entered the home, against evidence that his mental illness rendered him incapable of conforming his conduct to the requirements of the law. On those facts, I believe that there is a reasonable probability--that is, one sufficient to undermine confidence in the outcome--that but for the failure to present that mitigating evidence, the result would have been different. See Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 1513-14 (2000). I would therefore conclude that Matheney received ineffective assistance of counsel at sentencing, and would reverse and remand on that issue as well.