# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-2838

CEDELL DAVIS,

*Petitioner-Appellant,*

v.

GREGORY LAMBERT, Warden,[*]

*Respondent-Appellee.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 1140—**James F. Holderman**, *Judge.*

_____

ARGUED OCTOBER 27, 2003—DECIDED NOVEMBER 4, 2004

_____

Before RIPPLE, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* A dispute between two intoxicated
friends turned lethal when Cedell Davis stabbed Donovan
(also known as David) Coleman as they watched football
together one afternoon. Before, during, and after his trial,
Davis implored his counsel to investigate a number of
potential witnesses who would have supported his claim of

---

[*] We have substituted Gregory Lambert, the current warden of
Big Muddy River Correctional Center, the prison where Davis is
incarcerated, for the former warden, Michael L. Holmes.

self-defense, including the only sober eye-witness to the al-
tercation. Notwithstanding these pleas, his attorneys never
contacted any of the witnesses that Davis identified and
called no defense witnesses at trial. After making his way
through the Illinois courts, Davis filed a *pro se* petition for
habeas corpus stating a claim of ineffective assistance of
counsel based on his attorneys' failure to investigate these
witnesses.

The district court rejected his claim as procedurally de-
faulted and further found that the Illinois courts had not
unreasonably applied *Strickland v. Washington*, 466 U.S.
668 (1984),when they concluded that his attorneys' failure
to contact these witnesses was reasonable and that he suf-
fered no prejudice as a result. Because we cannot provide a
meaningful review of Davis's habeas petition and the
Illinois courts' adjudication of his *Strickland* claim without
more information regarding the content of these potential
witnesses' testimony, we vacate the district court's denial of
Davis's habeas petition and remand for an evidentiary
hearing on this issue.

# I

On September 2, 1996, Davis, Coleman, Lovell Love, and
Moses Perry were watching football at Davis's apartment in
the Hilliard Homes, a Chicago Housing Authority (CHA)
development. Davis, Coleman, and Love were all intoxicated.
An altercation between Davis and Coleman erupted when
the latter attempted to use illegal drugs in Davis's apart-
ment. Davis angrily forbade him from doing so, out of con-
cern that the CHA would evict him if his guests used drugs.
Coleman then demanded that Davis repay a $17 debt and
threatened to have Davis ousted from a newspaper sales job
with the *Chicago Sun-Times*. Davis then demanded that
Coleman leave his apartment, whereupon the argument
quickly escalated into a physical confrontation.

The parties dispute the details of the fight, but they agree that it culminated in Davis's stabbing Coleman once in the leg and once in the chest. At trial, Davis argued that he acted out of self-defense. According to Davis, Coleman reached for his waistband in a threatening manner and then stabbed Davis with a round-tipped knife, which prompted Davis to grab a sharp knife. Davis testified that he feared that Coleman, who was 15 years younger, would overpower him. Davis stabbed Coleman in the leg, but Coleman continued to wrestle with Davis, attempting to grab Davis's hand holding the sharp knife. As Davis began to fall, he fatally stabbed Coleman in the chest. At some point immediately before or immediately after Davis stabbed Coleman, Love awoke from his alcohol-induced slumber and attempted to separate the parties. Davis instructed Love to call 911 and then unsuccessfully attempted to resuscitate Coleman.

The State argued that Davis could not claim self-defense because Coleman was unarmed throughout the altercation. It did so despite the fact that a second blood-stained knife, which Davis had used earlier in the day to fix his stereo system, was recovered from the area in which the fight occurred. Neither party introduced evidence regarding whose blood or fingerprints were on the knife. The parties also dispute Love's account of the incident. At trial, the State called Love to testify that Coleman did not have a knife at the time of stabbing, consistent with Love's statement to the police after the incident. On cross-examination, however, Love conceded that he "probably" told Davis's neighbor, Robert Williams, immediately after the incident that Coleman *had* attacked Davis with a knife. The State also called as a witness a police detective who testified that Davis gave a statement after his arrest stating that Coleman had been unarmed during the encounter. Davis moved to suppress this statement, asserting that he was high and incoherent during the altercation and the interview because he was still under the influence of a three-day binge of alcohol, cocaine, and heroin use.

Davis experienced difficulties with his counsel from the outset. The state trial court ultimately replaced Assistant Public Defender David Eppenstein, who first represented Davis, with Public Defender Charles Buchholz. Prior to and after his bench trial, Davis vigorously objected to his attorneys' failure to investigate potential defense witnesses, including Perry, the only sober eye-witness to the altercation. His attorneys presented no witnesses at trial, other than Davis, who testified against counsel's advice. The court ultimately held that Davis had not proved self-defense by a preponderance of the evidence and that the state had proved the elements of first-degree murder. It also found, however, that Coleman's use or threatened use of drugs in Davis's home was a mitigating factor sufficient to establish "a sudden and intense passion," which, under Illinois law, allows for conviction for second-degree murder. See 720 ILCS 5/9-2. The court found Davis guilty of second-degree murder and sentenced him to 18 years in prison. Davis filed a *pro se* motion for a new trial, arguing ineffective assistance of counsel based on his attorneys' failure to investigate the witnesses he identified. The court denied his motion.

Davis appealed his conviction, contending that the trial court erred in failing to investigate his ineffective assistance of counsel claim. In its order rejecting his direct appeal, the Illinois Appellate Court acknowledged that "[p]rior to trial, defendant, who at this time was represented by a different assistant public defender than the one who had represented him at the suppression hearing, advised the court that he had seven witnesses, but his attorney would not even consider five of them and made no effort to contact them." In addition, the court found that at sentencing, Davis had "reminded the court that he had seven witnesses whom his attorney refused to present." The court concluded, without further explanation, that "under these circumstances the trial court adequately inquired into the nature of defendant's allegation of ineffective assistance of counsel, learned that

defense counsel's failure to present the evidence or testimony was a result of appropriate trial strategy, and properly found defendant's allegations without merit."

Davis then filed a *pro se* post-conviction petition in state court, raising a claim of ineffective assistance of counsel based on his attorneys' failure to investigate the potential defense witnesses, whom Davis identified and whose proposed testimony he described in his petition. These witnesses included: Perry, the only sober eye-witness to the altercation; Robert Williams, who would have testified that Love had told him that Davis stabbed Coleman only after Coleman attacked Davis with a knife; Deana Bradley, who would have testified to Davis's "intoxicated and confused" state when he was taken to the police station following the stabbing, contradicting the interviewing detective's testimony that Davis was coherent during his interview; Kimberly Oliver, a character witness and resident of Davis's building who would have testified to Coleman's propensity for violence; Sharon Pierce, who would have corroborated Davis's testimony that the second knife, which Davis claims Coleman used to threaten him, had been used by Davis to fix the stereo prior to the fight; Mrs. McKinnely, the CHA manager for Davis's building, who would have testified to Coleman's destructive and physically abusive nature; and "certain Chicago police officers," who would have testified to a "violent fight" they had with Coleman after they tried to arrest him for assaulting his girlfriend. Davis explained that "the reason there are no affidavits included in this Post-Conviction petition is because the entire complex building where all of my potential witnesses resided (which is CHA), has been evac[u]ated and defendant is [u]nable to locate any of the five witnesses['] new residency." In addition to seeking post-conviction relief, Davis specifically asked that the court "afford him an evidentiary hearing" on his claims.

The Cook County Circuit Court rejected Davis's post-conviction petition and his *Strickland* claim, stating in full:

I find that under *Strickland*, first of all, the conduct of his counsel did not rise to the level of ineffective assistance of counsel that it denied Mr. Davis his constitutional rights to a fair trial and his constitutional rights under the 6th Amendment.

I also find that under the second prong of *Strickland* that his allegations, even if this type of evidence was admitted in, would not change the results.

Therefore, I find that there has been no effective assistance of counsel denial in this case . . . .

Davis appealed to the Illinois Appellate Court, which also rejected his petition. With respect to his *Strickland* claim, the court stated only: "Defendant's petition was subject to dismissal at the first stage of proceedings where his claim of ineffective assistance of trial counsel was *res judicata* or otherwise lacking in the requisite support . . . ." Neither court addressed Davis's request for an evidentiary hearing on his *Strickland* claim. The Illinois Supreme Court summarily denied Davis leave to appeal.

Davis then filed a *pro se* habeas petition in federal district court, arguing among other things that his trial counsel was ineffective for failing to call the seven potential defense witnesses that he had identified. The court observed that the Illinois Appellate Court had found that Davis's *Strickland* claim was *res judicata* and that he had failed to state a cognizable claim of ineffective assistance of counsel. The district court concluded that "[s]ince the Illinois rule of *res judicata* and failure to state a claim are independent and adequate state law grounds, Davis' claims of ineffective assistance of trial counsel . . . are all dismissed with prejudice as procedurally defaulted" (internal citation omitted). The court nonetheless went on to address the merits of Davis's *Strickland* claim, concluding:

This court finds that the Illinois Appellate Court's ultimate resolution of this issue [was] not an unreasonable

application of clearly established federal law. This court finds that there is no evidence to otherwise suggest that Davis' trial counsel was deficient . . . in not tendering the seven potential witnesses. This court also finds no evidence demonstrating how any alleged deficiency by trial counsel prejudiced Davis's case.

On this basis, the court held that Davis could not obtain habeas relief based on his *Strickland* claim.

Davis then filed a notice of appeal, which we construed as an application for a certificate of appealability. We granted the certificate of appealability with respect to the questions whether Davis had procedurally defaulted his *Strickland* claim and whether the state court's resolution of that claim was a reasonable application of *Strickland*.

## II

The first question we must address is whether Davis has procedurally defaulted his *Strickland* claim. If the district court correctly concluded that the Illinois court's reliance on *res judicata* was an adequate and independent state ground for rejecting the petition, then Davis's quest for habeas corpus relief is over. See *Harris v. Reed*, 489 U.S. 255, 262 (1989) ("[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." (internal citation and quotation marks omitted)). "We review the district court's procedural default ruling *de novo*." *Hadley v. Holmes*, 341 F.3d 661, 664 (7th Cir. 2003). Our task here is relatively easy, as the State has conceded on appeal that neither of these grounds constitutes a procedural forfeiture and thus neither precludes federal habeas review of his claim.

"[W]e have repeatedly held that *res judicata* is not a bar to consideration of claims in a federal habeas action." *Moore v. Bryant*, 295 F.3d 771, 776 n.1 (7th Cir. 2002); *Patrasso v. Nelson*, 121 F.3d 297, 301 (7th Cir. 1997). In *Page v. Frank*, 343 F.3d 901(7th Cir. 2003), for example, the state appellate court "based its disposition of the ineffective assistance of . . . counsel claim on its conclusion that the merits of the claim had been resolved previously." *Id.* at 907. We explained that "[s]uch a merit-based determination is not a bar to further consideration in a federal habeas action; [f]ederal review is precluded only by procedural forfeitures, not by *res judicata* concerns. Consequently, the district court erred in its determination that the issue of ineffective assistance of . . . counsel was barred by a procedural default." *Id.* (internal citations and quotation marks omitted). Likewise, we have held that "dismissal for failure to state a claim is a decision on the merits." *State v. City of Chi.*, 137 F.3d 474, 478 (7th Cir. 1998); *Paganis v. Blonstein*, 3 F.3d 1067, 1071 (7th Cir. 1993) ("[U]nless the judgment provides otherwise, . . . a dismissal for failure to state a claim under Rule 12(b)(6)[ ] is an adjudication on the merits."); *Lee v. Vill. of River Forest*, 936 F.2d 976, 981 (7th Cir. 1991).

As the Illinois Appellate Court relied exclusively on these two grounds in rejecting Davis's *Strickland* claim, his claim is not procedurally defaulted and his federal habeas corpus petition is properly before us. We turn then to the district court's alternate ruling on the merits of his claim.

### III

Davis seeks habeas corpus relief exclusively on the ground that he was denied his Sixth Amendment right to effective assistance of counsel when his attorneys failed to investigate any of the seven potential defense witnesses that he identified. Our review of Davis's petition is governed in the first instance by the Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, which permits a federal court to issue a writ of habeas corpus only if the state court reached a decision on the merits of a claim, and that decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see also *(Terry) Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). Under *Strickland*, a defendant alleging ineffective assistance of counsel must show that trial counsel's performance fell below "an objective standard of reasonableness," 466 U.S. at 688, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. *Strickland*'s first element requires proof that the petitioner's trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Our review of the attorney's performance is "highly deferential" and reflects "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). The second part of the *Strickland* inquiry requires a showing of prejudice, that is, proof that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A "reasonable probability" of a different result is one "sufficient to undermine confidence in the outcome." *Id.* at 694.

In Davis's case, we face a preliminary question. The record as it now stands is devoid of the kind of information about the potential testimony of the defense witnesses that he has identified that we would need in order properly to assess the conclusions of the Illinois courts under the *Strickland* standards. See *Matheney v. Anderson*, 253 F.3d 1025, 1040 (7th Cir. 2001) ("An adequate record is impera-

tive to properly evaluate ineffective assistance claims."); see also *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 245 (7th Cir. 2003) ("[T]he district court could not assess what impact the exculpatory eyewitnesses likely would have had upon [the petitioner's] trial without hearing their testimony."); *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987) ("When the allegation of the ineffectiveness of counsel centers on a supposed failure to investigate, we cannot see how, especially in the context of a habeas proceeding that collaterally attacks the state court conviction, the petitioner's obligation can be met without a comprehensive showing as to what the investigation would have produced."). In particular, we cannot properly review the Illinois courts' determination that Davis did not suffer prejudice due to his counsel's failure to investigate these potential witnesses without knowing the content of their testimony. We must decide, therefore, whether Davis showed enough to require an evidentiary hearing to flesh out the record, or if the district court was within its discretion to decide the case based solely on what was before it.

The availability of an evidentiary hearing on habeas review is addressed in 28 U.S.C. § 2254(e)(2), which provides that no such hearing may be held "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings," subject to several narrow exceptions provided in § 2254(e)(2)(A) and (B). Davis argues that § 2254(e)(2) does not bar a hearing in his case because he has satisfied its requirement that he develop the factual basis of his *Strickland* claim before the Illinois courts. In these circumstances, his eligibility for a hearing in federal court should be determined under pre-AEDPA standards. The State ignores this issue in its brief on appeal. It contends only that Davis's claim does not come within § 2254(e)(2)(A) and (B). The Supreme Court has made clear, however, that "[b]y the terms of its opening clause the statute applies only to

prisoners who have 'failed to develop the factual basis of a claim in State court proceedings.' " *(Michael Wayne) Williams v. Taylor*, 529 U.S. 420, 430 (2000); see also *id.* at 435 ("[O]nly a prisoner who has neglected his rights in state court need satisfy these conditions."); *Hampton*, 347 F.3d at 234. Thus, we do not apply § 2254(e)(2)(A) and (B) unless Davis comes within the provision's opening clause—that is, unless the failure to develop the factual basis of the claim should be attributed to Davis.

The Supreme Court has held that "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435; *Boyko v. Parke*, 259 F.3d 781, 791 (7th Cir. 2001) ("The Court emphasized that the focus ought to be on whether the petitioner was diligent in his efforts to develop the facts, not on whether the facts were discoverable."). The Court further explained that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437.

We look first to see if Davis was diligent in pursuing his opportunities to develop the necessary facts in the state courts. Because this is a claim for ineffective assistance of counsel, the relevant place to look is the state post-conviction proceeding, as these facts are virtually never in the direct appeal record. In Illinois, "[p]ost-conviction petitions are adjudicated through a three-stage process set forth by the Post-Conviction Hearing Act[,] 725 ILCS 5/122-1 *et seq.* (West 2002)." *People v. Gardner*, 810 N.E.2d 180, 184 (Ill. App. Ct. 2004). "In the first stage, the petition must state

the gist of a constitutional claim or it will be summarily dismissed. . . . At the second stage, the petitioner must make a substantial showing of a constitutional violation to survive dismissal. Only then will the petition advance to the third stage, an evidentiary hearing." *Id.* (citing *People v. Edwards*, 757 N.E.2d 442 (2001)). Under the Illinois Post-Conviction Hearing Act, a petitioner must attach to his initial post-conviction petition "affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2. As to evidentiary hearings, the Act provides only that "[t]he court *may* receive proof by affidavits, depositions, oral testimony, or other evidence." 725 ILCS 5/122-6 (emphasis added). Where a petitioner seeking post-conviction relief in the Illinois courts "did not seek an evidentiary hearing . . . or even attempt to raise the issue," however, this court has held that he "failed to develop the factual basis" of a claim in State court proceedings. *Harris v. McAdory*, 334 F.3d 665, 670 (7th Cir. 2003).

In his *pro se* post-conviction petition, Davis requested that the court grant him an evidentiary hearing, described the anticipated content of the testimony of each of the seven witnesses that he had asked his counsel to investigate, and explained that the reason he had not submitted any affidavits from those witnesses was because he was unable to locate them as a result of the CHA's decision to move tenants away from the building where they lived. Davis verified the facts stated in his petition with a sworn affidavit. This explanation for Davis's difficulty in locating the five witnesses who resided in the Hilliard Homes is credible in light of the CHA's well-documented difficulties in tracking the tenants displaced during rehabilitation of its properties. See, *e.g.*, Liam Ford, *CHA OKs contract to track ex-tenants*, CHI. TRIB., Aug. 22, 2001 ("Resident leaders and their attorneys have said the CHA has not been able to provide proof it is keeping track of residents as the residents are relocated from

public housing developments being demolished."); see also Evan Osnos, *CHA OKs preservation of Hilliard Homes*, CHI. TRIB., Sept. 14, 2000 (noting that the "Hilliard complex is now less than half-full"). This explanation is not applicable, of course, to the unnamed Chicago police officers or McKinnely, the CHA building manager, whom Davis also identified as potential witnesses that his attorneys failed to investigate. We have no reason to upset the conclusion of the Illinois courts that these latter witnesses were not essential to Davis's claim.

Despite Davis's submissions and his explanation for the lack of affidavits, the state post-conviction court did not give him a hearing. Davis, however, did all that he could, and we therefore conclude that he is not responsible for failing "to develop the factual basis of his claim in State court" under § 2254(e)(2). According to *Williams*, "the relevant inquiry is . . . not simply whether the petitioner theoretically could have discovered the evidence while he was still in the state forum, but whether he made appropriate efforts to locate and present that evidence to the state courts." *Hampton*, 347 F.3d at 240 (citing *Williams*, 529 U.S. at 435). It is not reasonable to characterize Davis's efforts as less than diligent. Davis repeatedly implored his various trial attorneys, the state trial court, and the state post-conviction court to assist him in obtaining the testimony of these witnesses. As we have previously observed, the requirement under § 2254(e)(2) that a petitioner develop the factual basis of a claim should not bar her from obtaining an evidentiary hearing on habeas corpus review, when the basis of her *Strickland* claim is counsel's failure fully to develop the record below. See *Matheney*, 253 F.3d at 1039 ("[J]ustice dictates that a hearing on whether counsel was constitutionally deficient in failing to establish Petitioner's competency to stand trial cannot be barred by counsel's failure to secure a hearing and develop a record—the very product of the alleged ineffectiveness."). Indeed, it would defy logic to deny

Davis an evidentiary hearing on whether his counsel's failure to investigate the witnesses violated *Strickland* on the ground that he did not fully present those witnesses' testimony to the state courts. We therefore find § 2254(e)(2) no bar to an evidentiary hearing on Davis's *Strickland* claim.

Even in the absence of this statutory bar, however, Davis is not necessarily entitled to an evidentiary hearing. If § 2254(e)(2) does not apply, "it is then necessary to evaluate the request for an evidentiary hearing under pre-AEDPA standards." *Matheney*, 253 F.3d at 1039; *Hampton*, 347 F.3d at 244 n.12. Under pre-AEDPA standards, a federal evidentiary hearing is required only if (1) the petitioner alleges facts which, if proved, would entitle him to relief and (2) the state courts, for reasons beyond the control of the petitioner, never considered the claim in a full and fair hearing. *Id.*; see also *Townsend v. Sain*, 372 U.S. 293, 312 (1963) ("Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at time of the trial or in a collateral proceeding."), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). Applying this test to Davis's case, we find that Davis was entitled to an evidentiary hearing on his *Strickland* claim.

Davis has alleged facts which, if proved, would entitle him to habeas corpus relief. Accepting the allegations in Davis's own affidavit, the eye-witnesses and impeachment witnesses Davis wanted to call would have bolstered his self-defense claim (a complete defense to conviction, it is important to recall) and confirmed his confused state of mind at the time of his arrest and confession. It is undisputed that none of Davis's three court-appointed attorneys investigated *any* of the witnesses that Davis identified. Indeed, his attorneys never called any defense witnesses. Davis's only witness was himself, taking the stand against his attorneys' advice.

Davis objected to his attorneys' failure to investigate these witnesses twice before trial, at sentencing, on direct appeal, in his *pro se* post-conviction motion, on appeal of the denial of his post-conviction motion, and, finally, in his *pro se* habeas petition. At his pretrial hearing, Davis informed the court that his attorney, Assistant Public Defender Eppenstein, had "omitted key witnesses that could be instrumental in [his] defense." Davis also stated: "[T]here is a second eye witness by the name of Moses that my attorney is aware of that hasn't been presented to the Court's attention." While the court said it would hold a hearing on this and Davis's other objections to his counsel's conduct, no such hearing ever occurred. Rather, the court substituted Public Defender Buchholz as counsel for Davis. At trial, Davis stated: "Your Honor, I had several witnesses [Buchholz] didn't consider. I had seven. . . . I have a reason why I want them here." The court informed Davis that the trial would begin that day, but that it would require attorney Buchholz to provide an "explanation why these people are not coming in or what he has done to get ahold of them or couldn't get ahold of them by the next court date." Buchholz never provided such explanation during trial. At sentencing, Davis again stated: "On the issues of witness[es], none of the seven I requested in my behalf were located or [ ] my [Public Defender] didn't choose to call them." Davis then described the testimony that witnesses Bradley and Williams would have provided. While Buchholz acknowledged that Davis "told [him] the names of witnesses," his only explanation for his decision not to call them was the conclusory statement that his "theory of the case didn't require the use of those witnesses." He never explained how he knew this without even talking to the witnesses.

The Supreme Court has made clear that counsel's failure to investigate potential defenses may constitute deficient performance under the first prong of *Strickland*. In *Strickland* itself, the Court stated that "counsel has a duty to

make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691; see *Williams*, 529 U.S. at 395 (finding deficient performance where counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood"). Applying *Strickland*, we have repeatedly found that counsel's failure to investigate potential witnesses can constitute deficient performance. In *Washington v. Smith*, 219 F.3d 620 (7th Cir. 2000), for example, we found that the Wisconsin trial court had unreasonably applied *Strickland* in finding that counsel was not deficient when he investigated only one of the 14 witnesses identified by the defendant and made only half-hearted efforts to locate that witness, *id.* at 630-31. Emphasizing that "a failure to investigate can certainly constitute ineffective assistance," we stated that "[t]elling a client, who is in custody awaiting trial, to produce his own witnesses . . . falls painfully short of conducting a reasonable investigation." *Id.* at 631. "[H]ad [the Wisconsin court] properly applied *Strickland*, it would have concluded that [counsel's] failure to subpoena a hard-to-find witness until the eleventh hour and his failure to try to ascertain what exculpatory evidence 'new' witnesses might have were flagrant examples of ineffective assistance." *Id.* at 631-32; see also *Hampton*, 347 F.3d at 251; *Hall v. Washington*, 106 F.3d 742, 750 (7th Cir. 1997); *Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir. 1996); *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990); *Chambers v. Armontrout*, 907 F.2d 825, 831 (8th Cir. 1990) (*en banc*).

Of course, it is not sufficient for Davis to show only that counsel failed to investigate potential witnesses. He must also "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). Davis's theory at trial was one of self-defense. According to Davis, Coleman had threatened to use

drugs in Davis's apartment, triggering an argument between the two. Davis testified that Coleman "pulled a knife that [Davis] had out, . . . and he charged at [Davis] with it while [Davis] was at the time attempting to call the police on the telephone." Fearing that the younger Coleman would over-power him, Davis stabbed Coleman in the leg and, as they wrestled to the ground, again in the chest. The detective who interviewed Davis testified that he had not seemed intoxicated when he informed the police that Coleman had not wielded a knife during the altercation. At trial, how-ever, Davis denied making the statement and claimed that he was incoherent, coming off a three-day binge of cocaine, heroin, and alcohol use.

We consider the relevance of the witnesses that Davis identified, and that his counsel failed to investigate, against this backdrop. First, and most troubling, Davis's attorneys did not investigate Moses Perry. There were only two eye-witnesses to the fight between Davis and Coleman: Love, who was intoxicated and asleep during most of it, and Perry, who was sober and awake throughout. Davis's counsel never contacted Perry, despite the State's reliance on Love as its lead prosecution witness and the obvious importance of this potential testimony to Davis's self-defense argument. Second, Davis's attorneys did not interview Williams. Love testified, consistent with his statement to the police at the time of Davis's arrest, that Coleman did not have a knife in his hands during the altercation. According to Davis, Williams would have testified that Love told him immediately after the incident that Coleman *did* have a knife in his hands. Third, Davis's counsel did not contact Bradley, who allowed Davis to wear her shoes when he was arrested because he "was so perplexed and high" that he was barefoot as he left his apartment. Davis identified Bradley as "the only mutual party . . . that witnessed [his] condition shortly before [he] was questioned," and a person who could have testified to Davis's state of mind when he was arrested. Finally, though

less significantly, Davis's counsel did not inquire further regarding the identity of the other witnesses Davis identified at the start of trial or make any attempt to investigate their potential testimony.

As Davis relied exclusively on a theory of self-defense at trial, his counsel's failure to interview Perry, the only other eye-witness to the altercation, is inexplicable. Furthermore, given that Davis's defense turned on whether Coleman posed a serious threat—including whether he wielded a knife— we are mystified by his attorneys' decision not to contact Williams, who would have impeached the State's lead witness on this crucial issue, and Bradley, who would have testified contrary to the police detective regarding Davis's mental condition when he informed the police that Coleman did not have a knife. Counsel's sole explanation for his failure to call these witnesses was that his "theory of the case didn't require the use of those witnesses." Counsel's *post hoc* explanation for this failure to investigate is entirely inadequate: how could "a theory of the case" that relies on self-defense "not require" the testimony of the only eye-witness to the altercation who was sober and alert, as well as that of other witnesses who would impeach testimony presented by the State regarding whether the victim was armed?

"Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris*, 894 F.2d at 878; see also *Crisp v. Duckworth*, 743 F.2d 580, 584 (1984) (counsel should not be allowed to shield his failure to investigate simply by raising claim of "trial strategy and tactics"). Here, neither Davis's counsel nor the State has presented anything worthy of being called a strategic defense. In *Hall*, we explained that an attorney's decision not to present particular witnesses "can be strategically sound if it is based on the attorney's determination that the testimony the witnesses would give might on balance harm rather than help the defendant. Such

a determination can rationally be made, however, only after some inquiry or investigation by defense counsel." 106 F.3d at 749 (internal citation omitted). While "[t]his does not mean that only a scorch-the-earth strategy will suffice, . . . it does mean that the attorney must look into readily available sources of evidence." *Id.* (internal citation omitted). Yet Davis's attorneys never contacted or interviewed Perry, Williams, or Bradley, although Davis had named them as defense witnesses and described their potential testimony.

On post-conviction review, neither the circuit court nor the Illinois Appellate Court provided any explanation as to why this failure did not render the performance of Davis's lawyers deficient. In the absence of any reasonable explanation for the failure of Davis's counsel to conduct even a cursory investigation of these witnesses, the state courts' finding that Davis's counsel was not deficient might be found an unreasonable application of the first part of the *Strickland* analysis even under the deferential standard of § 2254(d)(1). See *Hampton*, 347 F.3d at 256. It is certainly enough to satisfy the pre-AEDPA standard.

Davis is entitled to relief, however, only if he is also able to show that his counsel's deficient performance prejudiced his defense in violation of *Strickland*'s second element. To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This is the determination we cannot make without more detailed knowledge of the content of the testimony of Davis's proposed witnesses, and on which an evidentiary hearing is necessary. Further development of the record may ultimately confirm the State's position that Davis suffered no prejudice from his lawyers' deficient performance, but at this point in the proceedings, it is far from clear that

the state courts did not unreasonably apply *Strickland* in finding no prejudice. See *Hampton*, 347 F.3d at 256.

Assuming that Davis's witnesses testify as he predicts they will, he may be able to show a reasonable probability that the Illinois trial court would have credited his theory of self-defense and acquitted him if his counsel had introduced these witnesses. Under Illinois law, one is justified in the use of deadly force in self-defense "only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another . . . ." 720 ILCS 5/7-1. Perry's testimony, for example, would lend credibility to Davis's assertion that he "was scared and feared for [his] life." In response, the State argues that Davis's self-defense argument is crippled by his own testimony at trial that the knife wielded by Coleman during their struggle "had a round tip." Davis also testified, however, that he and Coleman struggled over the butcher knife in Davis's hand, with Coleman "grabbing at the knife" as Davis fell to the ground. According to Davis, he delivered the fatal blow to Coleman in an attempt to fend off Coleman's attempts to seize the butcher knife, an unquestionably lethal weapon. If Perry's testimony supports this account, there is a reasonable probability that a court could find, in accordance with the Illinois self-defense statute, that Davis "reasonably believe[d] that such force [was] necessary to prevent . . . great bodily harm to himself." See 720 ILCS 5/7-1.

The State also argues that Bradley's and Williams's proposed testimony "offered nothing that would have supported" Davis's contention that he was engaged in self-defense when he fatally stabbed Coleman. The Illinois Appellate Court reached the same conclusion on direct appeal. It had this to say about Davis's proffer of Bradley's and Williams's testimony:

> [Davis] said nothing about the witnesses' testimony that would have supported his theory. Because defendant's

> mental state after the stabbing was not at issue in de-
> termining his guilt and in light of the fact that Love
> actually testified at trial, we find that defendant failed
> to demonstrate how the witnesses' testimony would
> have changed the outcome of the trial.

But this passage reveals that the court was focusing on the wrong point. Davis did not want to use their testimony to prove his mental state *after* the stabbing. Instead, he wanted to use it to bolster his claim of self-defense, which was the only seriously contested issue at trial. Both Bradley's and Williams's testimony was potentially relevant to the validity of this defense. At trial, the State relied on two key witnesses in challenging Davis's self-defense argument. First, the State called Love, who stated to the police that Coleman was unarmed when Davis stabbed him. The Illinois Appellate Court, on direct appeal, found that "in light of the fact that Love actually testified at trial," Davis suffered no prejudice due to his counsel's failure to interview Williams. According to Davis, Williams would have testified that Love told him after the fight that Coleman had a knife in his hands when he struggled with Davis. While the Illinois Appellate Court correctly states that the limits of Love's testimony were well-exposed at trial, including his being intoxicated and asleep for most of the altercation, it is significant that the State relied on Love's statement to the police to undermine Davis's self-defense argument. As this defense was the crux of Davis's case, Williams's testimony would have been important to impeach Love.

Second, the State relied on the testimony of the police detective who took Davis's statement immediately following his arrest. In light of this testimony, the Illinois Appellate Court's statement that the "defendant's mental state after the stabbing was not at issue in determining his guilt" is especially problematic. It was crucial to the question whether Davis's statements to the officer were made knowingly and voluntarily. The detective testified that Davis was not under

the influence of drugs or alcohol when he made his statement that Coleman was "standing with both his hands palm open to him" and "had no weapons in his hands" when Davis stabbed him. This alleged confession sharply undercut Davis's self-defense argument. According to Davis, however, Bradley's testimony would have established that when the police arrested him, he was high after a three-day binge of cocaine, alcohol, and heroin use and thus incapable of making a coherent statement to the police. Bradley's testimony, in combination with other factors suggesting that the detective's testimony may not be entirely sound, including the officers' failure to record Davis's unsigned statement until a month later, might have caused the court to question the validity of the detective's account of Davis's statement.

We therefore find that Davis has satisfied the first requirement for an evidentiary hearing under the pre-AEDPA standard, in that he has alleged facts which, if proved, would entitle him to relief. We turn now to the second requirement, that "state courts—for reasons beyond the control of the petitioner—never considered the claim in a full and fair hearing." *Matheney*, 253 F.3d at 1039. Davis has met this requirement, as he never received a "full and fair" hearing on his *Strickland* claim. We have already found, in the context of § 2254(e)(2), that Davis did everything he was able to do to develop the factual basis of his claim in the court proceedings. As Davis adequately developed the material facts of his claim, he need not show cause and prejudice as a prerequisite for obtaining an evidentiary hearing. See *id.* (requiring no showing of "cause and prejudice" under pre-AEDPA standards for federal evidentiary hearings after finding § 2254(e)(2) inapplicable because the petitioner did not "fail to develop" his claim); *cf. Spreitzer v. Schomig*, 219 F.3d 639, 648 (7th Cir. 2000) ("Under pre-AEDPA law, if a petitioner has failed to adequately develop material facts in previous state court proceedings, we again apply the 'cause and prejudice' standard to determine whether an

evidentiary hearing is warranted."). Rather, he must simply show that the Illinois courts "never considered the claim in a full and fair hearing."

The record of the Illinois courts' decisions shows that they did not conduct a "full and fair hearing" of Davis's *Strickland* claim. On post-conviction review, the Illinois Circuit Court, dispensed with his claim in a mere three sentences, saying only that "the conduct of his counsel did not rise to the level of ineffective assistance of counsel that it denied Mr. Davis his constitutional rights," and "his allegations, even if this type of evidence was admitted in, would not change the results." The court did not acknowledge Davis's request for an evidentiary hearing on his *Strickland* claim. The Illinois Appellate Court offered a similarly abbreviated review, dismissing his claim as simply "*res judicata* or otherwise lacking in the requisite support."

This cursory review did not constitute a "full and fair hearing." By ignoring Davis's request for an evidentiary hearing and perfunctorily rejecting his *Strickland* claim, the circuit court foreclosed development of the record on his claim. It did so despite the significant concerns regarding counsel's performance that we have identified and his explanation for the absence of affidavits from the witnesses. See *Hampton*, 347 F.3d at 244. The circuit court also failed to provide "full and fair" review of Davis's claim by imposing too high a bar for a showing of prejudice under *Strickland*. In denying Davis's claim, the court explained that his allegations "would not change the results" in his case. *Strickland*, however, provides that to establish prejudice, "[t]he defendant must show that there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694 (emphasis added). The Court specifically rejected the notion that a defendant must "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Thus, in requiring Davis to show that the witnesses' testimony

would have changed the result in his case, the circuit court imposed a standard even more rigorous than that rejected in *Strickland*. See *Williams*, 529 U.S. at 405-06 ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.' "); *cf. Woodford v. Visciotti*, 537 U.S. 19, 22, 24 (2002) (deferring to the California Supreme Court's rejection of the petitioner's *Strickland* claim because the court had "set[ ] forth the 'reasonable probability' criterion, with a citation to the relevant passage in *Strickland*" and it "proper[ly] fram[ed] the question as whether the evidence 'undermines confidence' in the outcome of the sentencing proceeding").

The Illinois Appellate Court did not correct this error in its post-conviction review decision. The Appellate Court's dismissal of Davis's *Strickland* claim on *res judicata* grounds likewise denied Davis a full and fair hearing on his claim. While a decision on the merits, the court's reliance on *res judicata* serves only to direct us to its decision on direct appeal. On direct appeal, Davis argued that "the trial court erred in failing to investigate Cedell Davis' allegation that his attorney was ineffective by accepting, without question" counsel's reason for not contacting Davis's potential witnesses. This, of course, is a claim of trial error, not a *Strickland* claim. As the Appellate Court did not have Davis' *Strickland* claim before it on direct appeal, its subsequent dismissal of his claim on *res judicata* grounds on post-conviction review effectively denied Davis of any meaningful review of his claim. In light of all this, we cannot find that Davis had a full and fair hearing on his *Strickland* claim. Therefore, he is entitled to an evidentiary hearing on this claim.

## IV

We cannot properly review Davis's petition for habeas corpus relief in the absence of more detailed information about the anticipated testimony of the witnesses that he has identified. As Davis has satisfied the requirements for an evidentiary hearing, we VACATE the district court's denial of habeas corpus relief and REMAND for an evidentiary hearing in accordance with this opinion. Finally, we note that we appointed counsel to represent Davis on appeal. We urge the district court on remand to consider seriously any renewed motion for appointment of counsel.

EVANS, *Circuit Judge*, dissenting.  This, at least to me, is a fairly simple case. It is undisputed that Davis killed Coleman by stabbing him in the chest with a knife during a fight more than 8 years ago. While Coleman went to the cemetery, Davis went to court charged with murder in the first degree. He faced a sentence of between 20 to 60 years or up to life in prison if convicted as charged. But, no doubt due at least in part to the efforts of his trial counsel (the one who, if this habeas proceeding is ultimately successful, must have been constitutionally ineffective) Davis escaped conviction on the charge of first degree murder and was found guilty instead of the lesser offense of murder in the second degree. He received a sentence of 18 years.

Davis says he was denied the effective assistance of counsel because his attorney failed to investigate a self-defense claim—that Coleman had a knife (one, apparently, with a "round tip") when he was killed. The Illinois courts that reviewed this claim correctly identified *Strickland* as the controlling Supreme Court precedent and determined, among

other things, that Davis failed to meet its "prejudice prong." The district court, in denying habeas relief, found, under AEDPA, that the state courts' resolution of the issue was not unreasonable. I agree with that conclusion and would affirm the denial of Davis's petition for relief.

Some of the facts, as reported, are bizarre. As the majority puts it, the Coleman/Davis altercation "erupted" when Coleman "attempted to use illegal drugs in Davis's apartment" and Davis "forbade him from doing so . . . ." This scenario seems a tad strange as the majority goes on to report (at page 3) that Davis himself was "high and incoherent" at the time and "still under the influence of a three-day binge of alcohol, cocaine, and heroin use."

-2-

The case against Davis had three components: Coleman's dead body; the testimony of Lovell Love, who was in the apartment during the fight and, as the majority puts it, "awoke from his alcohol-induced slumber and attempted to separate the parties"; and a detective who testified about Davis's statements after his arrest. The detective testified that Davis said Coleman was not armed during the encounter. Love, in his testimony, agreed.

Given this state of affairs, I would say Davis's lawyer must have done a fairly good job, for he avoided a conviction on the more serious charge of first degree murder. Despite this state of affairs, the majority orders a remand to the district court to conduct an evidentiary hearing and flesh out what seven uncalled witnesses (only one of whom, Moses Perry, was even in the apartment when Coleman was killed) have to say about the case. This order comes despite the fact that Davis has never properly proffered (with, for example, affidavits) what the unheard testimony would be. We also don't know if any of the missing seven "witnesses" can even be found. As I see it, Davis has fallen woefully short of meet-

ing the strict requirements for getting a rare federal court evidentiary hearing. The governing statute, 28 U.S.C. § 2254(e)(2), provides:

> If the applicant has failed to develop the factual basis of a claim in State Court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on-
>
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

During state postconviction proceedings, Davis failed to put forth affidavits, or anything similar, to substantiate his claim about the substance of the missing testimony.

-3-

Finally, as I see it, Davis cannot satisfy the requirement that the facts underlying his claim of self-defense which could be developed at the evidentiary hearing would be sufficient to establish by, as the statute requires, "clear and convincing evidence" that "no reasonable fact finder" would have found him guilty of second degree murder. For these reasons, I respectfully dissent.

A true Copy:
    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*